126 F.3d 794
 21 Employee Benefits Cas. 1745,
Pens. Plan Guide (CCH) P 23937W
Maria MATTEI, Plaintiff-Appellant.
v.
Ronald MATTEI, Individually and as Executor for the Estate
of Louis J. Mattei; Mary Laura Mattei,
Defendants-Appellees.
 No. 96-5443.
 United States Court of Appeals,
Sixth Circuit.
 Submitted March 18, 1997.
Decided Sept. 25, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 12, 1997.*
Rehearing Denied Dec. 18, 1997.**
 
 Robert W. Griffith (briefed), Michael I. Kanovitz (briefed), Susan C. Reisner (briefed), Stites & Harbison, Louisville, KY, for Plaintiff-Appellant.
 Walter L. Sales (briefed), Thomas M. Williams (briefed), Ogden, Newell & Welch, Louisville, KY, for Defendants-Appellees.
 Before: MERRITT, KRUPANSKY, and BOGGS, Circuit Judges.
 BOGGS, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. MERRITT, J. (pp. 810-11), delivered a separate dissenting opinion.
 BOGGS, Circuit Judge.
 
 
 1
 Maria Mattei ("Mattei" or "Maria") appeals the district court's dismissal with prejudice of her lawsuit brought under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., and its dismissal without prejudice of her pendent state-law claims. We conclude that Mattei has stated a claim cognizable under ERISA, and we reverse.
 
 
 2
 * Before Louis J. Mattei married his second wife, Maria, the couple executed an antenuptial agreement. The agreement provided that, in the event Maria survived her husband, she would, for the duration of her life, have the right to live in the marital residence, and would receive from Louis's estate a payment of $300 per week (plus an annual six-percent escalator). In return, she surrendered all other claims to Louis's estate.[1]
 
 
 3
 Just over a year later, on December 28, 1991, Louis died. His son, Ronald, was appointed executor of the estate. In accordance with the antenuptial agreement, Mattei began receiving her weekly payments. However, a dispute immediately arose over the proper recipient of the death benefits provided by an ERISA-covered pension plan ("the Plan") in which Louis was a participant at his place of employment. Although the antenuptial agreement limited Maria's claims to those mentioned above, the Plan administrator promptly determined, under the provisions of the Plan, that Maria was entitled to the death benefits thereunder, and paid her a lump-sum settlement in February 1993.[2] We glean from Mattei's brief that the estate unsuccessfully pursued appeals with the plan administrator regarding that determination.
 
 
 4
 At the end of the first year of making payments to Mattei, the estate failed to increase Mattei's weekly payments by six percent, as provided by the antenuptial agreement. Then, in December 1994, the estate stopped the weekly payments to Mattei altogether. In November 1995, she filed a complaint in district court against the estate, Ronald (its executor and a legatee under Louis's will), and Mary Laura Mattei (Louis's daughter and a legatee under his will), alleging that the defendants ceased the payments in order to deprive her of the benefits to which she was entitled under the Plan,[3] and in retaliation for her acceptance of those benefits, both in violation of § 510 of ERISA, 29 U.S.C. § 1140, and sought an injunction and damages. The complaint further included a number of pendent allegations under Kentucky law.
 
 II
 
 5
 * In March 1996, the district court granted the estate's motion to dismiss. In dismissing Mattei's ERISA claim, the district court relied on three rationales: (1) the estate's cessation of the weekly payments did not fall within the statute's list of proscribed actions; (2) the estate was not an entity covered by § 1140; and (3) case law has limited § 1140 to "actions affecting the employer-employee relationship."
 
 
 6
 "We review de novo a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). We must treat as true all of the well-pleaded allegations of the complaint. All allegations must be construed in the light most favorable to the plaintiff. In order for a dismissal to be proper, it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint." Bower v. Federal Express Corp., 96 F.3d 200, 203 (6th Cir.1996) (citations omitted).
 
 
 7
 We begin by setting forth the relevant provisions of ERISA. Section 1140 (ERISA § 510) states:
 
 
 8
 It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or by statute] or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or by statute].... The provisions of section 1132 [ERISA § 502] of this title shall be applicable in the enforcement of this section.[4
 
 
 9
 As we shall discuss in detail later, ERISA does not define any of the verbs used in § 1140 ("discharge, fine, suspend, expel, discipline, or discriminate") to describe illegal conduct.
 
 
 10
 Section 1132(a) is "a carefully integrated civil enforcement scheme that is one of the essential tools for accomplishing the stated purposes of ERISA." Ingersoll-Rand v. McClendon, 498 U.S. 133, 137, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) (internal quotations and citations omitted); see also Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir.1992) ("In general, section 1132 [ERISA § 502] authorizes the prosecution of civil suits to enforce substantive rights granted by the statute"). Mattei's lawsuit was brought under § 1132 to enforce her rights as described in § 1140. Section 1132(a) provides, in pertinent part, that:
 
 
 11
 A civil action may be brought--
 
 
 12
 (1) by a participant or beneficiary--
 
 
 13
 ...
 
 
 14
 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;...
 
 
 15
 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....
 
 
 16
 Section 1002, ERISA's definitional section, includes the following terms, all of which will be pertinent to our analysis:
 
 
 17
 (5) The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.
 
 
 18
 (6) The term "employee" means any individual employed by an employer.
 
 
 19
 (7) The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.
 
 
 20
 (8) The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.
 
 
 21
 (9) The term "person" means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.
 
 B
 
 22
 In a case brought under ERISA by an employee who claimed that his employer fired him to prevent his attainment of benefits under an ERISA plan, the Supreme Court stated:
 
 
 23
 By its terms § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. Congress viewed this section as a crucial part of ERISA because, without it, employers would be able to circumvent the provision of promised benefits. S.Rep. No. 93-127, pp. 35-36 (1973); H.R.Rep. No. 93-533, p. 17 (1973). We have no doubt that this claim is prototypical of the kind Congress intended to cover under § 510.
 
 
 24
 Ingersoll-Rand, 498 U.S. at 143, 111 S.Ct. at 485.
 
 
 25
 Presaging the Court's identification of the § 510 prototype, this court observed in West v. Butler, 621 F.2d 240, 245 (6th Cir.1980), that "[t]he legislative history [of § 1140] reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights" (emphasis added). It is a bit odd that West is the leading § 1140 case, because its facts are far from "prototypical." As part of a collective bargaining agreement with the Southern Labor Union, certain coal mining companies in Appalachia had established a pension plan funded by a specified financial contribution per ton of coal production. When secondary boycotters (apparently striking members of the United Mine Workers who were attempting to shut down all the coal mines in the eastern United States, 621 F.2d at 242 n. 2) succeeded in severely curtailing coal production by these companies, and, consequently, contributions to the plan, the plan's trustees sued the boycotters under § 1140. They alleged that the boycotters, by indirectly preventing the flow of funds into the pension plan, were interfering with participants' attainment of benefits under the plan.
 
 
 26
 This court affirmed the district court's dismissal of the complaint, holding that § 1140 does not "allow[ ] pension fund trustees to file civil actions to enjoin secondary picketing." Id. at 241. In reaching that conclusion, the court analyzed the statute as follows:
 
 
 27
 Congress had a specific type of problem in mind when it enacted sections 510 and 511:These provisions were added by the Committee in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals. Although the instances of these occurrences are relatively small in number, the Committee has concluded that safeguards are required to preclude this type of abuse from being carried out and in order to completely secure the rights and expectations brought into being by this landmark reform legislation.
 
 
 28
 S.Rep. No. 93-127, 93d Cong., 2d Sess., reprinted at [1974] U.S.Code Cong. & Admin. News pp. 4838, 4872.
 
 
 29
 The legislative history reveals that the prohibitions [of § 1140] were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. [The opinion here quotes a statement by Senator Hartke on the need to protect workers from being fired or constructively discharged for the purpose of depriving them of pension benefits, and the use of language ("discharge, fine, suspend, expell [sic], discipline or discriminate") paralleling that in § 8(a)(3) of the National Labor Relations Act to accomplish such protection.] Thus, it appears Congress designed § 510 primarily to protect the employment relationship that gives rise to an individual's pension rights....
 
 
 30
 Of course, an individual's employment relationship may be disrupted in a variety of ways.... Regardless of its form, however, we conclude that discrimination, to violate § 510, must affect the individual's employment relationship in some substantial way.
 
 
 31
 Measured by this standard, the trustees' complaint does not state a cause of action. Its essential allegation is that the defendants picketed the ... mines in order to undermine the plans' fiscal integrity. However, § 510 as we read it does not purport to protect the financial security of pension funds. Rather, the section is aimed solely at protecting individual rights.
 
 621 F.2d at 245-46.[5]
 
 32
 Phrases from West--"designed primarily to protect the employment relationship," and "discrimination, to violate § 510, must affect the individual's employment relationship in some substantial way"--are now thoroughly embedded in § 510 jurisprudence. See, e.g. Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3d Cir.1987); Varhola v. Doe, 820 F.2d 809, 816 (6th Cir.1987); Blaw Knox Retirement Income Plan v. White Consolidated Indus., Inc., 998 F.2d 1185, 1191 (3d Cir.1993); Adcox v. Teledyne, Inc., 21 F.3d 1381, 1390 (6th Cir.1994); Abbott v. Pipefitters Local Union No. 522, 94 F.3d 236, 242 (6th Cir.1996); Andes v. Ford Motor Co., 70 F.3d 1332, 1338 (D.C.Cir.1995). It appears that Congress "aimed primarily" at the spot where the greatest danger of abuse would lie, for, "in fact, most of the reported decisions under section 510 involve an employer-employee relationship." Blake v. H-2A and H-2B Voluntary Employees' Beneficiary Ass'n, 952 F.Supp. 927, 932 (D.Conn.1997). Consequently, most holdings derive from such contexts.
 
 C
 
 33
 The frequent recitation, in § 1140 case law, of West 's "employment relationship" phrase, may appear at first glance to restrict § 1140 to employer-employee relationships. The district court relied on several cases it believed suggested such a limitation: Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491 (3d Cir.1994), Gavalik, Adcox, Varhola, and West itself. As we shall discuss presently, a few cases particularly lend themselves to that interpretation. However, we do not believe that these cases make such a blanket holding.
 
 
 34
 Two observations about the above-quoted passage from West above seem pertinent. First, in the court's statement that "Congress designed § 510 primarily to protect the employment relationship," the use of the word "primarily" necessarily means that, in the court's view, Congress intended that the statute sometimes reach beyond the employment relationship. The overarching goal of the statute was to protect rights conferred by an employee benefit plan, and the court recognized that the most common, but not the only possible, attack on those rights would be through the employment relationship. Notably, the committee report quoted in West, 621 F.2d at 245, evinced Congress's desire for § 510 to protect pension rights and expectations from "economic sanctions"--a broad description not limited to the sphere of employment. Thus, the district court erred in relying on West for the proposition that § 1140 covers only conduct related to employment relationships. The district court's reliance on Gavalik is similarly misplaced, for that case simply invokes West 's conclusion as to the primary aim of § 1140, 812 F.2d at 851, without in any way suggesting that such was the sole aim.
 
 
 35
 Second, this passage has proved most influential as support for the conclusion of many courts, in § 510 "interference" cases, see n.4 supra, that § 510 is aimed not at protecting the status of the ERISA plan itself (specifically, under the facts of West, the financial security of the SLU pension fund), but rather at protecting the attainment of individual rights conferred by an ERISA plan. Thus, when courts, quoting West, state that "discrimination, to violate § 510, must affect the individual's employment relationship in some significant way," they generally do so in order to make the point that, by contrast, § 510 offers no protection against an employer's actions affecting the status or scope of an ERISA plan itself.
 
 
 36
 In Adcox, for example, defendant Teledyne, Inc., had altered its ERISA plan in connection with a plant closing, and former employees sued. This court affirmed the district court's dismissal of the § 1140 claim in part on the grounds that "Teledyne's conduct affected only the terms of the pension plan, not the employment relationship as contemplated by Congress." 21 F.3d at 1391.
 
 
 37
 In Deeming v. American Standard, Inc., 905 F.2d 1124 (7th Cir.1990), the defendant employer altered a provision of its pension plan so as to eliminate employees' option, in the event of a plant shutdown, effectively to exchange severance pay for additional service credit for pension purposes. After citing West as to the purpose of § 510, the Seventh Circuit held that "a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way." Id. at 1127. The court further reasoned that ERISA's provision, in § 204(G), for protection against discriminatory modifications of pension plans supported its conclusion that § 510 "is simply not the appropriate vehicle for redressing the unilateral elimination of severance benefits accomplished independently of employee termination or harassment." Id. at 1128.
 
 
 38
 Similarly, in Haberern, the defendant employer had altered the terms of its ERISA plan so as to reduce life insurance coverage for persons over the age of fifty-six, while raising it for others, an amendment that hurt the plaintiff alone. In deciding whether this sort of "discrimination" was actionable under § 1140, the Third Circuit adopted the employer's argument that "while [§ 1140] prohibits discrimination against a plan participant for the purpose of interfering with the attainment of plan rights, it does not prohibit plan amendments which affect only one person," 24 F.3d at 1502, and concluded that "[o]ur analysis compels us to hold that the appellants' action in adopting the life insurance amendment is not actionable under section 510," id. at 1504. The court relied in part on West 's observation that the primary purpose of § 1140 was to prevent the harassing and discharging of employees in order to prevent their attainment of vested pension benefits, id. at 1502-03, a different proposition from altering those benefits.
 
 
 39
 And in McGath v. Auto-Body North Shore, Inc., 7 F.3d 665, 668 (7th Cir.1993), the employer twice amended the eligibility requirements of a plan, just before the plaintiff employee met them--a maneuver the court assumed was aimed specifically at the plaintiff, id. at 668. Citing West, the court rejected the proposition that § 510 might "encompass discrimination in the plan itself rather than the employment relationship." Ibid. Accord Hines v. Massachusetts Mut. Life Ins. Co., 43 F.3d 207, 210 n. 5 (5th Cir.1995) ("Two circuits have restricted the scope of § 510 to acts that affect the employer-employee relationship; in other words, plan amendments by themselves cannot be actionable under § 510" (citing Haberern and McGath )); Aronson v. Servus Rubber, Div. of Chromalloy, 730 F.2d 12, 16 (1st Cir.1984) (§ 510 "relates to discriminatory conduct directed against individuals, not to actions involving the plan in general;" reserving, however, the possibility that a modification of a plan "intentionally benefitting, or injuring, certain identified employees" could be discriminatory under § 510).
 
 
 40
 From a review of these cases involving employers' alterations of ERISA plans, we think that, rather than viewing attacks on the "employment relationship" as a sine qua non of § 510 coverage, it is more appropriate to view "employment relationship" as an illustrative but non-exclusive description of a set of rights that are protected by § 510, as compared to (as Deeming put it) "merely the pension plan," which is not.[6]
 
 III
 
 41
 In Deeming, the court stated that " § 510 was designed to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a pension right." 905 F.2d at 1127. Though the court relied on West for this proposition, it omitted the qualification found therein that the statute was "primarily" so aimed. Deeming thus permitted the inference that the statute was exclusively aimed at protecting the employment relationship. Similarly, in McGath, the court stated in passing that "we believe that the protections of § 510 are properly limited to employment situations that affect pension rights," 7 F.3d at 669. Haberern, 24 F.3d at 1503, approved the reasoning of McGath. Possibly the courts intended this language to be categorical, rather than simply, as we have suggested above, part of an argument that actions taken with respect to the plan itself are not protected by § 510. If they did, we disagree. The conclusion that § 1140 covers only conduct affecting "the employment relationship" is insupportable.
 
 
 42
 To begin with, it is certain that § 1140 also covers acts affecting union membership--a different sort of relationship, even though it is one that will sometimes indirectly affect the employment relationship. ERISA's definition of "person" includes "employee organization." 29 U.S.C. § 1002(9). The genesis of the statute shows that this was no random inclusion. ERISA supplanted the Welfare and Pension Plans Disclosure Act of 1958, 29 U.S.C. § 301 et seq. ("WPPDA"); among other similarities, ERISA's definitions of "person," "participant," and "beneficiary" are identical or virtually identical to those in the WPPDA. Congress enacted the WPPDA in the wake of investigations by Senator McClellan's Committee on Improper Activities in the Labor or Management Field, investigations best known for their revelations of union corruption. Second, two of the words used to describe illegal conduct, "fine" and "expel," are not terms commonly used to describe actions taken by employers against employees. They are, however, commonly used in connection with actions of a union against a member. The McClellan Committee investigations also resulted in passage of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq., (the "Landrum-Griffin Act"), one section of which (sometimes denominated the "Labor Bill of Rights") protects members of labor organizations from being "fined, suspended, expelled, or otherwise disciplined" by the organization without fair procedures. 29 U.S.C. § 411(a)(5). Although we do not find legislative history to show that this section of the Landrum-Griffin Act was a model specifically for § 1140, there is a marked similarity between the terms used in the two laws, and we know that, in the process leading to ERISA's passage, Landrum-Griffin was cited as an earlier attempt by Congress to prevent abuse of pension funds. See, e.g., S.Rep. No. 93-127 (1974), reprinted in 1974 U.S.C.C.A.N. 4840 ("Various aspects of pension plans have been affected to some degree by most of the major labor legislation of the twentieth century, including the National Labor Relations Act (1935), the Labor-Management Relations Act (1947), and the Labor-Management Reporting and Disclosure Act (1959)"); SUBCOMMITTEE ON LABOR OF THE SENATE LABOR AND PUBLIC WELFARE COMM., 93D CONG., SUBMISSION OF CONFERENCE REPORT ON ERISA 10 (Comm. Print 1973) (statement of Sen. Griffin) ("It has been 14 years since Congress approved any type of pension protection legislation. That action [the WPPDA] followed closely on the heels of the Landrum-Griffin Act in 1959. Additional reforms are urgently needed now."). Similarly, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(c), makes it unlawful for labor organizations, among other acts, to "expel" individuals because of race, color, religion, sex, or national origin.
 
 
 43
 The inclusion of these union-related actions alone is adequate basis for rejecting an unqualified assertion, if such we find in McGath, that § 1140 is limited to the employment relationship, and the court's assertion in Haberern that the term "discriminate" "should be limited to actions affecting the employer-employee relationship," 24 F.3d at 1503. However, it does appear that the words Congress chose to describe the conduct that § 510 makes illegal are generally terms of art related to labor law, broadly conceived.[7] "Discharge," "suspend," "discipline," and "discriminate"commonly mean actions sometimes taken by employers against employees. "Discharge" and "discriminate" are terms used in Section 8 of the National Labor Relations Act, 29 U.S.C. § 158, and are among the terms describing forbidden employer conduct in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). Cases interpreting § 1140 have often pointed to the legislative history suggesting that Section 8 of the NLRA was a model for § 1140. See, e.g., West, 621 F.2d at 245 & nn.4-5. And we have already noted the usage of the words "fine," "suspend," "expel," "discipline," and "discriminate" in statutes regulating the conduct of labor organizations. On the basis of Congress's use of terms from labor law to describe illegal conduct in § 1140, it could still be argued that the section protects primarily against actions affecting employment relationships, and residually against conduct affecting union membership--but against nothing else.
 
 
 44
 We reject this limitation, too. Section 1140 explicitly extends its protections to, and § 1132(a) explicitly creates a cause of action for, beneficiaries and participants alike. Surely only a small proportion of designated beneficiaries will ever have been employed by the participant's plan sponsor or fiduciary, or, where the sponsor or fiduciary is a union, been a member. It would make no sense for Congress to have included the word "beneficiary" in § 1140 without intending to afford beneficiaries the protection of that section. Similarly, because the term "participant" includes former employees, see § 1002(7), many participants will no longer be in an employment relationship with the plan sponsor, or a member of an employee organization. Yet it is easy to imagine circumstances in which employers or unions might interfere with attainment (or continued enjoyment) of ERISA rights by former employees or members, or retaliate against them for seeking to exercise those rights. This reasoning was well stated by a panel of the Fourth Circuit (whose decision, however, was vacated on other grounds and never published[8]):ERISA's anti-retaliation provision broadly forbids an employer to engage in any form of "discrimination" against "participants" and "beneficiaries" in ERISA plans, 29 U.S.C. § 1140, a group that is defined by statute to include many individuals who are not currently engaged in on-going employment relations with the employer, such as former employees who are drawing benefits under ERISA pension or disability plans and family members of employees who are covered by ERISA health plans. See 29 U.S.C. § 1002(7) (defining "participant" to include both employees and former employees); id. § 1002(8) (defining "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder"). To read this anti-retaliation provision as applying only to acts of retaliation that substantially interfere with ongoing employment relations between the parties--a limitation that finds no support in its plain language--would be to make its protection unavailable, as a practical matter, to a large number of the participants and beneficiaries it was designed to protect. Absent more compelling evidence that Congress did in fact intend such an incongruous result, we decline to read into the statute a limitation that does not appear on its face and would obviously undermine its purpose.
 
 
 45
 Stiltner v. Beretta U.S.A. Corp., No. 94-1323, 1995 WL 25643, * 12 (4th Cir. Jan. 18.1995), rev'd, 74 F.3d 1473 (1996) (en banc); see also Stiltner, 74 F.3d at 1489 (Phillips, J., concurring in part and dissenting in part); but see id. at 1485 (Luttig, J., concurring in the judgment) ("I believe that [§ 1140] protects employees only against discriminatory actions that substantially affect the employment relationship....").
 
 
 46
 In short, we are faced with a situation in which Congress identified illegal conduct with a set of verbs borrowed from labor law, but defined the subjects and objects of those verbs--"person," "participant," and "beneficiary"--in ways that clearly extend beyond the realm of labor law. We could resolve this parity error, and save the statute from surplusage, by restricting the definitions of "person," "participant," and "beneficiary" so as to conform with a labor-related reading of "discharge, fine, suspend, expel, discipline, or discriminate." Or, we could interpret the latter words in a way that would accommodate the full statutory scope of the former.
 
 
 47
 Where Congress has explicitly defined in the statute one group of words, but not another, we think it is undesirable to reject the congressional definitions in order to embrace incompatible meanings of the undefined terms, even if such meanings could be inferred from those words' usages as terms of art.[9] Therefore, we construe "discharge, fine, suspend, expel, discipline, or discriminate" as permitting meanings beyond the context either of "the employment relationship" or of labor law generally.
 
 IV
 
 48
 Our conclusion that § 1140 reaches further than the employment relationship takes us only so far, however. We must still determine whether any of the words "discharge, fine, suspend, expel, discipline, or discriminate," even when thus untethered, describe the conduct complained of. Mattei alleged that the defendants "fined" and "discriminated" against her for exercising her right to receive her late husband's death benefits under an ERISA plan. The district court, quoting dictionary definitions of "fine" and "discriminate," held that "[i]t strains the plain language of the statute to state that the estate has discriminated against or fined Mattei," and thus concluded that "this claim does not fall within the purview of 29 U.S.C. § 1140."
 
 
 49
 We agree with the district court that Mattei's allegation that the estate "fined" her does not fit the meaning of that word, taken alone, under any plausible construction.[10] The definitions of "discriminate" and "discrimination" relied on by the district court are: "to distinguish; to make distinctions in treatment; show partiality or prejudice" (WEBSTER'S NEW WORLD DICTIONARY); and "a failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored" (BLACK'S LAW DICTIONARY).
 
 
 50
 Unlike the district court, we do not find the estate's action to be necessarily outside the dictionary definitions of "discrimination." If the estate, as alleged, stopped the payments because Mattei accepted Louis's death benefits, it showed "partiality or prejudice" against one who received funds that might otherwise have gone to the estate. And if the estate did not, as would seem improbable, withhold payments to all other beneficiaries or creditors of the estate, then withholding payments to Mattei was "a failure to treat all persons equally...."
 
 
 51
 Moreover, we believe that the words describing prohibited conduct partake of a collective meaning that is broader than might be found in the dictionary definition of any one of them. We note evidence of the wide scope that Congress intended these terms to have a within the context of employment, the "primary" area of concern. Commenting on the conference report, Sen. Javits stated:
 
 
 52
 Every employee is to have the right ... to be free from interference with his pension benefits. This means that he cannot be discharged, fined, suspended, expelled or otherwise interfered with in order to prevent him from receiving pension benefits or attaining eligibility for pension benefits.
 
 
 53
 SUBCOMMITTEE ON LABOR OF THE SENATE LABOR AND PUBLIC WELFARE COMM., 93D CONG., SUBMISSION OF CONFERENCE REPORT ON ERISA 28 (Comm. Print 1974). Similarly, a Member observed that, under the bills that would become ERISA, "[a]ny interference or discrimination against participants in order to interfere with their rights under the plan is unlawful." Written Statements Submitted by Interested Organizations and Individuals on H.R. 10470, Retirement Income Security for Employees Act Before the House Ways and Means Committee, 93d Congress (1973) (statement of Rep. Waldie). Senator Hartke's statement that the list of proscribed actions paralleled § 8(a)(3) of the N.L.R.A. suggests that the words were intended, collectively, to cover a broad range of discriminatory actions with respect to "hire or tenure of employment or any term or condition of employment." See 119 Cong. Rec. 30374, reprinted in Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, Pub.L. No. 93-406 (Comm. Print 1976), at 1774-75. See also 29 U.S.C. § 158(a)(3); NLRB v. Transportation Management Corp., 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983) (recognizing that NLRB has consistently construed the unfair labor practices of § 158 as including "a discharge or other adverse action " based on anti-union animus) (emphasis added). Senator Hartke was apparently particularly concerned with assuring that the language covered the wide variety of employer conduct that might constitute constructive discharge, and expressed cautious confidence that the language chosen "should do the trick."
 
 
 54
 This approach is consistent with the meaning courts have long given to the words "discriminate" or "discrimination" in other branches of employment law.
 
 
 55
 It is well-established that the concept of "discrimination" under [§ 8(a)(3) of the NLRA] is not limited to disparate treatment of similarly situated employees, but includes any adverse action taken against one or more employees because of their decision to engage in protected activities. F. Bartosic & R. Hartley, LABOR RELATIONS LAW IN THE PRIVATE SECTOR 114 (2d ed.1986); see Midstate Telephone Corp. v. N.L.R.B., 706 F.2d 401, 406 (2d Cir.1983) (any action taken against an employee that "attache[s] a penalty to [protected] activity" is "discriminatory" within the meaning of § 8(a)(3)); N.L.R.B. v. Borden, Inc., 600 F.2d 313, 320 (1st Cir.1979); N.L.R.B. v. Jemco, Inc., 465 F.2d 1148, 1152 (6th Cir.1972).... Retaliatory "discrimination" lies not in the fact that the employer is treating the employee less favorably than other similarly situated employees, but in the fact that it is treating him less favorably than it would have treated him had he not engaged in the protected activity. See Jemco, 465 F.2d at 1152 ("[The] discrimination ... lies in the employment benefit [being] afforded to [the employee] prior to [his] engaging in a [protected] activity," but "denied to [him] after [he] engaged in such an activity."). Disparate treatment in this regard may of course be persuasive evidence of "discrimination" within the intended meaning of § 8(a)(3), but it is not an essential prerequisite to a finding of such discrimination. See Borden, 600 F.2d at 320. As the Sixth Circuit has explained, a contrary holding "would lead to the somewhat absurd result that an employer could never be found in violation of [section 8(a)(3) ] so long as he was careful to treat all [similarly situated] employees alike, no matter how destructive of employee rights his conduct may be." Jemco, 465 F.2d at 1152.
 
 
 56
 The same interpretive reasoning applies to the anti-retaliation provision of ERISA § 510. Like NLRA § 8(a)(3), that provision is not designed to require employers to treat all persons under the base-statute's protections alike, but simply to prevent employers from using economic leverage to discourage certain activity by those persons that Congress wanted to protect. See Owens v. Storehouse, Inc., 984 F.2d 394, 398 (11th Cir.1993) ("[Section 510] does not broadly forbid all forms of discrimination" in employment benefits, only discrimination "designed to retaliate for the exercise of a right or to interfere with the attainment of an entitled right.").
 
 
 57
 This interpretation of the term "discriminate" in § 510's anti-retaliation clause is also consistent with the established interpretation of the same term in similar anti-retaliation provisions in other federal employment statutes. Both Title VII and the Age Discrimination in Employment Act contain provisions that make it unlawful for an employer to retaliate against individuals for attempting to enforce those statutes against it. [Footnote omitted.] Like § 510, both of these provisions forbid employers to "discriminate against" individuals for engaging in certain protected activity, but do not define the phrase "discriminate against." Both are consistently interpreted, however, to forbid an employer to take any kind of adverse action against an individual because he has engaged in the protected activity, even in the absence of evidence that it has treated him less favorably than other similarly situated individuals. See, e.g., Passer v. American Chem. Soc., 935 F.2d 322, 331-32 (D.C.Cir.1991) (employer's cancellation of special symposium in employee's honor could constitute actionable "discrimination" under ADEA's anti-retaliation clause, where done with specific intent to retaliate against him for asserting age discrimination claim against it); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985) (any "adverse employment action"). Because the anti-retaliation provision at issue here uses the same "discriminate against" language as those other provisions, and was enacted after them, we may presume that Congress intended it to have the same basic meaning.
 
 
 58
 Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1487-88 (4th Cir.1996) (en banc) (Phillips, J., concurring in part and dissenting in part).
 
 
 59
 In keeping with this legislative history and with established interpretations of related laws, we conclude that, in the employment situations Congress was "primarily" aiming at, the list of proscribed actions ("discharge, fine, suspend, expel, discipline, or discriminate") represents a kitchen-sink attempt at comprehensiveness, rather than a limitation by way of expressio unius, and should be construed to mean "any adverse action." Cf. McGath, 7 F.3d at 669 ("we must be mindful that § 510 protects the employee not only against the classical forms of employer harassment that might occasion the loss of benefits, but also against the more atypical forms of employer misconduct that can produce the same result").
 
 
 60
 Similarly, in cases not involving an employment relationship, § 1140's list of proscribed actions should be read, in essence, to mean "adverse actions." Indeed, there is an additional reason, in cases not involving the employment relationship, to give a broad construction to the words describing prohibited conduct. In keeping with its "primary" concern, Congress chose words that are terms of art in employment law, so there is a better "fit" between those words and employment relationships than there is between the words and non-employment relationships.
 
 
 61
 Accordingly, we have no trouble concluding that the defendants' alleged conduct was an adverse action covered by § 1140.
 
 V
 
 62
 We next turn to the question of whether the Mattei estate is an entity subject to § 1140. The district court acknowledged that "the estate falls under the literal definition of 'person' as set out in 29 U.S.C. § 1002(8) [sic]." The court, however, trimmed that definition as follows:
 
 
 63
 Viewing the prohibited acts identified in § 1140 as a group, it is clear that the "person" who would commit such acts will most often be the employer of the participant. An employer or someone who stands in some relationship to the employer or the plan would be in a position to "discharge, fine, suspend, expel, discipline or discriminate against" a participant.... While the term "person" may be broadly defined to include entities and organizations, the universe of persons who may be found to have violated the statute is limited to those persons who stand in relationship to a participant or a participant's beneficiary which enables such persons to commit the specified wrongful acts. We do not believe that the estate stands in such a relationship to Mattei. This case is a garden variety state law contract case, and the facts alleged do not suggest more.
 
 
 64
 The district court thus narrowed the statutory definition of "person" to fit employment-related meanings of the proscribed acts (albeit allowing a bit of slack for "someone who stands in some relationship to the employer or the plan"). This approach cannot survive our holding above that the "specified wrongful acts" must be given scope beyond the terms' technical meanings in labor law. Here, the estate was in the position to commit "the specified wrongful acts" against Mattei, by virtue of its control over the assets from which her alleged rights under the antenuptial contract were to be satisfied.[11]
 
 
 65
 Similarly, the district court also opined that the statute would rarely apply to an intended recipient of covered benefits other than the original participant in the plan. "While the statute protects a participant's beneficiary, we can divine few circumstances in which a person would be able to ['discharge, fine, suspend, expel, discipline or discriminate'] against a beneficiary." The district court's reasoning was somewhat, though not entirely, persuasive,[12] but, again, only if the proscribed conduct were limited to the employment context.
 
 VI
 
 66
 We have given serious consideration to the defendants' flood-gates argument, expressed in their brief as follows:
 
 
 67
 Mattei is clearly trying to manufacture an ERISA violation in an attempt to obtain federal jurisdiction. If Mattei succeeds, § 1140 will become a mechanism to transform almost any dispute into an ERISA violation. Any participant or beneficiary of a Plan could claim an ERISA violation any time the participant or beneficiary encountered adverse actions by any third party.... Any action that can be clothed, whether rightly or wrongly, with bad intent toward an ERISA beneficiary can confer federal jurisdiction.
 
 
 68
 Appellee Br. at 3, 10. We gather that the defendants would have us believe, for example, that an ERISA participant or beneficiary could bring suit under § 510 against an automobile mechanic who cheated her on a repair bill, or against an airline that refused to honor an ERISA participant or beneficiary's request to redeem frequent-flyer miles for a first-class ticket to Paris.
 
 
 69
 We first note that the feared inundation could be contained, if necessary, by summary judgment, which defendants may seek at any time after a complaint is filed. FED. R. CIV. PROC. 56(b). If the plaintiff makes nothing more than a bare allegation that the action complained of was taken for the purpose of retaliating against the exercise of ERISA rights, or with the intent to interfere with the attainment of those rights, summary judgment (or dismissal, if the court does not consider matters outside the pleadings, see FED. R. CIV. PROC. 12(b)) will lie. See Shahid v. Ford Motor Co., 76 F.3d 1404, 1411 (6th Cir.1996) ("The plaintiff 'must show that an employer had a specific intent to violate ERISA.' ... However, the plaintiff need not show that the employer's sole purpose ... was to interfere with her entitlement to benefits but rather only that it was a 'motivating factor' in the decision.' "); Adcox, 21 F.3d at 1391 ("No evidence suggests that Teledyne terminated or harassed the employees or otherwise altered the employment relationship to divest the employees of the benefits to which they were entitled"); Varhola, 820 F.2d at 816-17 ("Plaintiffs can point to no evidence that Cyclops deliberately discriminated against these employees for the purpose of interfering with their rights under the ... Plan"); West, 621 F.2d at 246 ("Nor, despite the trustees' contrary allegation in this case, can we conceive of any realistic set of circumstances that would give outsiders an incentive to engage in secondary picketing 'for the purpose of' interfering with protected pension rights.").
 
 
 70
 We also believe that through careful use of Rule 12(b)(6) the district courts can successfully stem the tide of litigation feared by the defendants. If a claim against a "person" who is a third party--that is, a person who is not involved in the funding or administration of the ERISA plan in question--is to survive a motion to dismiss, a plaintiff ordinarily must have alleged that the defendant possesses either responsibility for funding the plan, or a conflicting claim to either the disputed benefit or the funds underlying it. Without this factual predicate, it will be all but impossible to demonstrate a motive supporting the requisite "specific intent of violating ERISA." See Roush v. Weastec, 96 F.3d 840, 845 (6th Cir.1996). Therefore, our hypothetical automobile mechanic, assuming she had no such responsibility or competitive claim, would be entitled to have the claim against her dismissed, as would our hypothetical airline.
 
 
 71
 The requirements for stating a valid claim then differ according to whether the plaintiff brings an "interference" claim, or a "retaliation" claim. See n.4 supra. To state a valid interference claim, the plaintiff's allegations should state, or at least support the inference, that the defendant possessed some control over either the benefit or its underlying funds. That may also suffice for a retaliation claims, but in that class of cases such a showing of control is not mandatory, because actionable retaliatory conduct need not be taken for the purpose of retaining or recouping the disputed benefits. To give an example in the employment context, if an employer, annoyed over an employee's insistence on receiving certain ERISA benefits, transferred her (at the same salary) to some wretched backwater, that would clearly constitute a valid retaliation claim, although the company by its action in no way recaptured the cost of the contested benefits. The same would hold true, in a non-employment hypothetical, if a third-party defendant who lost out to a plaintiff in a contest over ERISA benefits sought revenge by defaming the plaintiff, even though the third party gained back nothing by means of the defamation. In contrast to interference claims, in which the alleged illegal action will have a causal connection to the plaintiff's ability to receive an identifiable benefit, the adverse actions alleged in retaliation claims will often have a subjective character, depending greatly on the plaintiff's peculiar vulnerabilities. This makes retaliation claims trickier for district courts to assess for adequacy at the dismissal stage. Any attempt at that point to apply a nexus test, whereby the action complained of would have to possess a logical linkage with the plaintiff qua recipient of benefits, would, in practice, collapse into the inquiry, on a defendant's motion for summary judgment, as to whether there was evidence to support a finding that the defendant took the action for the purpose of retaliating against the plaintiff for the exercise of ERISA rights. Cf. Humphreys, 966 F.2d at 1044 (approving holding that required showing by plaintiff of "a causal link between pension benefits and the adverse employment action" in order to survive motion for summary judgment).
 
 
 72
 ERISA does not impose a required minimum amount in controversy, nor does 28 U.S.C. § 1331, the federal question jurisdictional statute. Nonetheless, we believe that district courts can require the alleged retaliation to be more than utterly trivial; so, for example, if Maria sued her step-children under ERISA alleging that they stopped inviting her over for Sunday dinner out of spite over her receipt of benefits, the court would be entitled to dismiss the action: de minimis non curat lex.
 
 
 73
 Mattei has alleged both "interference" and "retaliation." She meets the first requirement of both types of claims, in that the defendants contested the funds underlying her ERISA benefits. The estate, and Louis as its executor, certainly had the power to interfere with Maria's continued enjoyment of the contested benefits: they could offset those benefits by withholding the weekly payments due to Maria under the antenuptial agreement.[13] She thus meets our second requirement for an interference claim. (As the case proceeds, of course, Maria will have to prove that the defendants withheld the payments for that purpose.) Treating her claim as one of retaliation, her allegation that the estate, and Louis as its executor, withheld payments has a logical linkage to her status as an ERISA beneficiary. Further, the means of retaliation was substantial, rather than de minimis.
 
 
 74
 The record does not provide sufficient information for us to assess, however, whether Mattei's claims against her stepdaughter, Mary Laura Mattei, survive these inquiries. Mattei's complaint merely identifies Mary Laura as Louis's daughter and legatee. As a legatee, she has an obvious financial interest in recouping for the estate the life insurance benefits awarded to Mattei. However, it is not apparent that Mary Laura has any control over the estate, and therefore any power to interfere with Maria's enjoyment of the ERISA benefit. Similarly, it is not clear what Mary Laura is alleged to have done to retaliate against Mattei for exercising her rights to the benefit. Therefore, the district court, on remand, should determine whether Mattei has stated a valid ERISA claim against defendant Mary Laura Mattei.
 
 VII
 
 75
 The dissent complains that our interpretation of § 1140 federalizes family law. I do not believe that we do any more than ERISA has already clearly accomplished by means of its broad preemption provision, 29 U.S.C. § 1144(a). In the context of divorces, ERISA preempts the terms of divorce decrees except to the extent that they constitute qualified domestic relations orders. See Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415 (6th Cir.1997). Where there is no QDRO, we have repeatedly held that awards of property pursuant to divorce decrees must fall before conflicting designations of ERISA beneficiaries. See n.2 supra. And, very recently, the Supreme Court held, in Boggs v. Boggs, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997), that community property laws--a keystone of family law in the states having such regimes--do not withstand ERISA preemption. The Court went so far as to say that "[t]his case involves a community property claim, but our ruling will affect as well the right to make claims or assert interests based on the law of any State, whether or not it recognizes community property." Id. at ----, 117 S.Ct. at 1760. By comparison, our holding adds little to the pre-existing breadth of ERISA preemption.
 
 
 76
 In any event, in this case we do not override the ability of a party to an antenuptial agreement to enforce rights thereunder. The estate is free to go to state court and argue that Maria breached her agreement with Louis by accepting the death benefits. Without presuming to assess how strong such a claim by the estate might be, rescission of the agreement, and even restitution of payments already made, might be remedies, depending on Kentucky's law of contract. If the estate brought a non-frivolous suit to this effect, it would not be retaliation, but simply an effort to enforce what it might legally be entitled to. In this sense, the case might still be, as the district court put it, "a garden variety state law contract case." However that may be, what the estate is not free to do is to invoke self-help by interfering or retaliating against Maria for a valid exercise of her ERISA rights.
 
 
 77
 The dissent suggests that our holding posthumously deprives Louis of his due process right, as a testator, "to condition the receipt of one form of assets upon choosing not to receive other assets." It was, after all, Louis who designated Maria as the beneficiary of his company insurance policy. If he did so after executing the antenuptial agreement, presumably it was with the understanding that it ran counter to the tenor of that pact. If he did so before signing the "prenup," he had it within his power to designate a different beneficiary. If anything, we would deprive the testator of due process (not to mention his powers under ERISA) were we to overrule the effect of his act, or failure to act.
 
 
 78
 The more lurid possibilities that the dissent envisions in its penultimate paragraph are not at issue today, and may well face a wide variety of insurmountable barriers. For today, we decide only what is before us, and for that, ERISA gives us the necessary guidance.
 
 VIII
 
 79
 For the foregoing reasons, we REVERSE the judgment of the district court, REINSTATE Mattei's ERISA claims and pendent state claims, and REMAND for further proceedings consistent with this opinion.
 
 
 80
 MERRITT, Circuit Judge, dissenting.
 
 
 81
 The Court holds that the anti-discrimination or anti-retaliation provision of § 1140 of ERISA preempts the State's family and probate law governing prenuptial agreements. The Court expands the coverage of this provision to family disputes that reach far beyond retaliation in the workplace.
 
 
 82
 I disagree that Code § 1140 federalizes the distribution of the testator's estate in this case or that it should be expanded beyond workplace discrimination. Here the surviving spouse in a prenuptial instrument expressly agreed to take only certain assets and income derived from her husband after his death, leaving the remainder for his children by a previous marriage. But when the time came to honor this agreement, according to the record before us, she claimed another significant asset created by her deceased husband, namely, the assets payable under an ERISA pension or savings plan.
 
 
 83
 The record before us is unclear about how the plan's administrator arrived at the conclusion that the surviving spouse is the beneficiary of the pension. The record does not disclose that the husband himself consciously named her as his beneficiary. By claiming such ERISA benefits, the surviving spouse received more than she had previously agreed to accept under the prenuptial agreement with her deceased husband, and she therefore deprived her husband's children of assets that they would have otherwise received had she complied with her contract. The trustee in return docked her trust income in order to recover money for the children.
 
 
 84
 Under these circumstances, I do not believe that there is a colorable argument that the trustee of the deceased husband's trust estate unlawfully retaliated against the surviving wife under § 1140 of ERISA when the trustee withheld trust assets. The action, if there is one, should be under the state law of trusts and estates to determine the testator's intention with respect to his assets and the meaning of the prenuptial agreement. If it was his intention to allow his wife to choose the trust assets or the nontrust ERISA assets, but not both, then the trustee's action should be upheld, but if not, then it should be set aside by the state court. The issue should be treated under state law as a question of interpretation of the prenuptial agreement and the law of trusts in light of the family circumstances, the deceased husband's intention and all of the facts surrounding the prenuptial agreement, as well as the deceased husband's will and trust and the terms and conditions of his ERISA assets. The surviving wife's action should be against the trustee in state court to enforce the trust, not an action in federal court under ERISA for retaliation.
 
 
 85
 A testator should be able to give a beneficiary of his estate a choice between ERISA pension or life insurance benefits and other non-ERISA assets of his estate without violating § 1140's vague "discrimination" provision. To read ERISA so broadly as to deprive a testator of the right to choose how such assets should be distributed to his family and to condition the receipt of one form of assets upon choosing not to receive other assets raises serious due process questions. Testators for centuries have exercised such authority over their property, and executors and trustees are obliged to carry out their intentions. The record before us indicates that the testator did not intend for his surviving spouse to receive both ERISA and non-ERISA assets.
 
 
 86
 In its lengthy opinion, the Court spends most of its time trying to get around the language of prior cases and legislative history limiting the operation of the anti-retaliatory provision to the workplace. I find no case law that holds or even intimates that battles between family members and executors and trustees over the assets of a deceased husband and father should be treated as an issue to be decided in federal court under the "discrimination" language of § 1140. Section 1140 should be given a much more limited scope. The state law of trust and estates should not be federalized through the back door of ERISA "discrimination" law. Under the court's broad, unlimited construction of § 1140, a federal claim would seem to arise each time a trust beneficiary is denied trust income or some asset or benefit as a result of choosing ERISA benefits.
 
 
 87
 If we continue to interpret vague terms of ERISA like "discrimination" broadly to federalize claims touching upon ERISA benefits, we will end up nationalizing much of the law of estates and trusts. When its provisions are unclear, ERISA's thrust should be given a narrow scope under the canon of statutory construction advising a narrow construction of the broad language of vague statutes which are in derogation of the common law.
 
 
 88
 The operative language of the ERISA provision to be interpreted makes it unlawful "for any person to ... discriminate against a participant or beneficiary for exercising any right ... under ... an employee benefit plan...." It is true that, literally speaking, the trustee's actions "discriminated" against plaintiff because she exercised rights under the plan. But discrimination would have occurred, literally speaking, if she had refused to marry the deceased husband until he made her a beneficiary under the plan, or if one of his children refused to speak to the father and stepmother until they agreed to give the ERISA money to the children, or if the stepmother refused to speak to the children until he agreed to give the money to her. (I do not understand why the court refers in its opinion to these examples as "lurid"--perhaps it intended to say "lucid.")
 
 
 89
 The anti-discrimination provision of the ERISA statute should not be read to include economic or emotional retaliation by family members, family trustees and parties and beneficiaries of family contracts, wills and trusts. Such family matters should continue to be treated as traditional areas of state law.
 
 
 
 *
 Judge Merritt would grant rehearing for the reasons stated in his dissent
 
 
 **
 Judge Merritt would adhere to the opinion in his dissent in the case, filed September 25, 1997
 
 
 [1]
 The antenuptial agreement does not appear in the joint appendix; these facts are derived from the opinion of the district court and the parties' pleadings and briefs
 
 
 [2]
 For the Plan administrator to distribute the benefits to the beneficiary designated under the Plan, rather than in keeping with the antenuptial contract, was consistent with the law of this and other circuits, which we recently summarized as follows:
 This court has held that the designation of beneficiaries has a connection with or reference to an ERISA plan, thereby preempting state law. See [Metropolitan Life Ins. Co. v.] Pressley, 82 F.3d at 129 [(6th Cir.1996)]; McMillan v. Parrott, 913 F.2d 310, 311 (6th Cir.1990), remanded on reh'g, 922 F.2d 841 (6th Cir.1990) (table); accord Brandon v. Travelers Ins. Co., 18 F.3d 1321, 1325 (5th Cir.1994); Krishna v. Colgate Palmolive Co., 7 F.3d 11, 14-15 (2d Cir.1993); Metropolitan Life Ins. Co. v. Hanslip, 939 F.2d 904, 906 (10th Cir.1991); Brown v. Connecticut Gen. Life Ins. Co., 934 F.2d 1193, 1196 (11th Cir.1991); MacLean v. Ford Motor Co., 831 F.2d 723, 727-28 (7th Cir.1987). We have held that ERISA itself supplies the rule of law for determining the beneficiary. Pressley, 82 F.3d at 130; McMillan, 913 F.2d at 311. Specifically, section 404(a)(1)(D) of ERISA requires that a plan administrator discharge his duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The court in McMillan, and again in Pressley, found that this section establishes a clear mandate that plan administrators follow plan documents to determine the designated beneficiary. See Pressley, 82 F.3d at 130; McMillan, 913 F.2d at 312. See also Boggs v. Boggs, 520 U.S. 833, ----, 117 S.Ct. 1754, 1764, 138 L.Ed.2d 45 (1997) (Congress intended to preempt nonbeneficiary nonparticipant interests in ERISA retirement plans).
 Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415, 420 (6th Cir.1997).
 
 
 [3]
 Mattei had already been paid the death benefits in a lump-sum payment; the deprivation, we gather, was alleged to be the making of an offset against the death benefits she was awarded. There is no allegation that the antenuptial agreement itself is an ERISA-covered plan
 
 
 [4]
 Section 1140 has been analyzed as offering protection against two types of conduct. In Furcini v. Equibank, NA, 660 F.Supp. 1436, 1439 (W.D.Pa.1987) (Aldisert, Circuit Judge, sitting by designation), the court described these as the "exercise clause" (covering adverse actions (there, a discharge) taken because a participant availed himself of an ERISA right) and the "interference clause" (covering interference with the attainment of a right under ERISA). In Stiltner v. Beretta U.S.A. Corp., No. 94-1323, 1995 WL 25643, at * 7-8, * 9 n. 9 (4th Cir. Jan. 18,1995), rev'd en banc on other grounds, 74 F.3d 1473 (4th Cir.1996), the court used the terminology "retaliation" or "anti-retaliation" clause or provision (for Furcini 's "exercise clause"), and " 'interference-with-attainment' provision."
 
 
 [5]
 The court also stated that it could not "conceive of any realistic set of circumstances that would give outsiders an incentive to engage in secondary picketing 'for the purpose of' interfering with protected pension rights." 621 F.2d at 246
 
 
 [6]
 We find persuasive in this regard the reasoning in the vacated and unpublished decision of Stiltner, n.4 supra, 1995 WL 25643, at * 9 n. 9 ("The cited cases [including West, Haberern, McGath, and Deeming ] relied upon by the dissent all involve efforts to base claims of violation of this right on conduct which, though it does not directly alter the employment relationship, 'discriminates' in a way that intentionally prevents the attainment of plan benefits.... These cases, therefore, say nothing about the secondary, anti-retaliation right.... Specifically, none purports, or could purport, to hold that the anti-retaliation right under § 510 extends only to conduct that 'affects the employment relationship.' To cite them for that proposition is therefore simply wrong.")
 
 
 [7]
 We note, however, that unlike the statutory language of Section 8(a)(3), which explicitly speaks of "discrimination in regard to hire or tenure of employment or any term or condition of employment," § 1140 does not include any such limitation
 
 
 [8]
 In Stiltner, the plaintiff was a former employee of Beretta U.S.A. Corp. At the time of his hiring, Stiltner suffered from a heart condition. The terms of his employment, codified in an offer letter, included a long-term disability plan that paid benefits until age seventy. The insurer of the disability plan, however, excluded coverage for pre-existing conditions. After a heart attack left Stiltner disabled, Beretta voluntarily paid his health-insurance premiums and, for some months, his salary, and assisted Stiltner in attempts to obtain long-term disability payments from the insurer of the company plan. When those efforts failed, Stiltner demanded that the company itself pay his long-term disability benefits, in accordance with his employment contract and the company's disability plan, and threatened an ERISA suit to enforce his rights under the plan. Beretta responded by threatening to discontinue payment of the health insurance premiums if Stiltner did not relinquish those claims. Beretta's threat formed the basis of a § 510 retaliation count in Stiltner's lawsuit
 The en banc court held that discontinuation of "gratuitous benefits" could not constitute retaliation under § 510. In support of that decision, the court noted that "numerous courts have limited 'discriminate against,' as used in § 510, to actions affecting the employer-employee relationship.... With this interpretation of the phrase 'discriminate against' so firmly entrenched, we are not inclined to ascribe a second meaning to the phrase in cases involving interference with the exercise of ERISA rights." 74 F.3d at 1484. The court, however, did not adopt this approach as its own, but relied instead on its "gratuitous benefits" theory.
 
 
 [9]
 This is not a situation where the terms of art used in a statute are so well-defined elsewhere as to render them a "phrase[ ] with a special legal meaning," as was the case in Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund, 916 F.2d 1154, 1158 (7th Cir.1990), where the court determined that the phrase "substantially all" was a term of art specifically meaning "85% or more."
 
 
 [10]
 The district court relied on these definitions:
 "Fine" is defined as "to order to pay a fine," WEBSTER'S NEW WORLD DICTIONARY, Simon & Schuster (1990); "To impose [to levy or exact as by authority] a pecuniary punishment or mulct [a penalty or punishment imposed on a person guilty of some offense, tort or misdemeanor, usually a pecuniary fine or condemnation in damages]." BLACK'S LAW DICTIONARY, 5th Edition, West Publishing Co. (1979).
 
 
 [11]
 In Tingey v. Pixley-Richards West, Inc., 953 F.2d 1124, 1132 n. 4 (9th Cir.1992), the court "rejected contentions that the statute's use of such terms as 'discharge, fine, suspend, expel, discipline [and] discriminate' suggests direct punitive action by one in a position to exercise control over the terms of employment." See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co., 80 F.3d 348, 350 n. 5. (9th Cir.1996), rev'd on other grounds, 520 U.S. 510, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997). In Inter-Modal, the Ninth Circuit relied on Tingey to reject the argument that " § 510 does not support a cause of action against a non-employer for conspiring with an employer to interfere with ERISA-protected benefits." The non-employer was a separate corporation to which certain work was transferred by the defendant railway, with the result that railway employees who took jobs with the successor corporation lost various ERISA-covered pension and welfare benefits. (The Supreme Court's decision in Inter-Modal, announced after oral arguments in this case, has no direct bearing here.)
 However, the court in Byrd v. MacPapers, Inc., 961 F.2d 157, 161 (11th Cir.1992), granted the motion to dismiss of Sun Life Assurance Co., a non-employer co-defendant. The court stated:
 As insurer of MacPapers' employee benefits plan [Sun Life] is not liable on the retaliatory discharge claim ... [which] under § 510 of ERISA lies only against MacPapers as her deceased husband's employer. [Here, the court cites Gavalik and West regarding the primary congressional aim of protecting employment relationship.] ... During the pendency of this appeal, Sun Life asked without success to be dismissed. Byrd's reply brief concedes that Sun Life is not a proper party to this appeal because only an employer can be sued in a § 510 retaliation action.
 
 
 [12]
 Even if one accepts the district court's limited view of what constitutes "discrimination," we do not think that it is so hard to think of circumstances in which the employer will have obligations to the participant's beneficiary other than those resulting from the plan, which the employer refuses to honor because the participant's beneficiary has asserted a claim to benefits under a plan. For instance, a widow might inherit shares in a closely-held corporation, and be discriminated against, among all shareholders, in the payment of dividends. A university might deny admission to the beneficiary of a deceased employee because the applicant insisted on receiving death benefits due. A company might decide not to repay money lent to it by a deceased officer. A beneficiary who inherited a participant's intellectual property rights might not receive licensing payments due thereunder. Further, there will be some fraction of cases in which a beneficiary is also an employee of the same entity as the participant, and thus subject to the proscribed actions even when construed as being limited to "employment relationships."
 
 
 [13]
 If the estate continued to withhold the weekly payments after recouping the full amount of the life insurance benefits, the claim would, analytically, then become one of retaliation, rather than interference