36 F.3d 1077
 63 USLW 2352, 18 Employee Benefits Cas. 2323
 Robert W. SMITH, individually and on behalf of a class of
all those similarly situated, Plaintiff-Appellant,
v.
NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Conservator
of America's First Credit Union, America's First Credit
Union, Principal Mutual Life Insurance Company, America's
First Credit Union Retirement Plan, America's First Credit
Union Retirement Savings Fund, America's First Credit Union
Nonqualified Retirement Plan, Defendants-Appellees.
 No. 93-6737.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 1, 1994.
 
 Robert G. Tate, A. Brand Walton, H. Graham Beene, Burr & Forman, Birmingham, AL, for appellant.
 Lynn E. Hare, Barker, Janecky & Newell, P.C., Glenn E. Estess, Jr., Alton B. Parker, Jr., Spain, Gillon, Grooms, Blan & Nettles, Birmingham, AL, for appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before CARNES and BARKETT, Circuit Judges, and JOHNSON, Senior Circuit Judge.
 BARKETT, Circuit Judge:
 
 
 1
 This is an appeal from a final decision of the district court granting summary judgment to all defendants in this certified class action under the Employee Retirement Income Security Act, 29 U.S.C. Sec. 1001 et seq. ("ERISA"). The parties stipulated to all the facts in this case and agreed that disposition should be by summary judgment. We affirm in part and reverse in part.I.
 
 
 2
 Plaintiff-appellant Robert Smith ("Smith") was an employee of defendant-appellee America's First Credit Union ("the Credit Union") from January 18, 1971 to July 31, 1991. The Credit Union employs approximately 215 people, among whom are members of the certified plaintiff class.
 
 
 3
 Defendant-appellee National Credit Union Administration Board ("the Administration"), in its position as conservator, has operated the Credit Union since 1991. Defendant-appellee Principal Mutual Life Insurance Company ("Principal") has acted as the Credit Union's advisor on pension plans, providing prototype employee retirement plans and accompanying services.[1]
 
 
 4
 When Smith began his employment, the Credit Union maintained two retirement plans: the Retirement Plan ("Pension Plan") and the Retirement Savings Fund ("Savings Plan"). Smith alleges that in 1988, the Credit Union created a third pension plan, known as the Rule of 90, which allowed employees to retire with full benefits when the sum of their age plus years of service equalled at least 90. The essence of Smith's complaint is that the Credit Union is liable for retroactively amending each of these three plans in a manner that reduced the participants' accrued benefits in violation of ERISA.[2] In addition, Smith asserts that Principal has a fiduciary relationship with the Credit Union and is, therefore, also liable for the alleged ERISA violations.
 
 
 5
 The district court concluded that the Credit Union did not retroactively amend the Pension and Savings Plans, and that the amendments thus did not reduce the plaintiff's accrued benefits. Because the court found no illegal amendments, the court entered summary judgment for Principal without reaching the issue of Principal's fiduciary status. Moreover, the district court concluded that because Smith would never become eligible for Rule of 90 benefits, he was an improper class representative for the Rule of 90 Plan. Accordingly, the court "rescinded" its certification of the Rule of 90 subclass and entered summary judgment for defendants on Smith's individual Rule of 90 claim, without prejudice to the claims of the unnamed members of the subclass.
 
 
 6
 We conclude that the trial court did not err in granting summary judgment on Smith's claims pertaining to the Rule of 90 Plan, but did err in finding that the amendments to the Pension and Savings Plans did not retroactively decrease accrued benefits. In addition, we affirm the court's order granting summary judgment to Principal, because, upon reaching the merits of the argument, we conclude that Principal is not a fiduciary of the Pension Plan.
 
 II.
 A. The Pension Plan
 
 7
 When Smith joined the Credit Union, the Pension Plan provided that normal retirement age for Plan participants was 62.[3] During an October 1989 meeting, the Credit Union Board ("the Board") discussed and orally approved several amendments to the Pension Plan, including one that would raise the retirement age from 62 to 65; however, the meeting's minutes reflected no such action. In October 1989, subsequent to this meeting, the Credit Union "posted and/or distributed"[4] a notice advising that it was changing the retirement age to 65 and that in order to receive the maximum pension accrual, an employee would have to work 35 years.[5] In January 1990, the Credit Union "posted and/or distributed" a second notice.[6]
 
 
 8
 On May 16, 1990, the Board met and, according to the minutes, the members "reaffirmed" the Pension Plan amendments they recalled "approving" at the October 1989 meeting. On February 1, 1991, a Credit Union officer signed a restatement of the Pension Plan containing the amendments,[7] but with an effective date of February 1, 1990.
 
 
 9
 The district court concluded that while the Board did not "formally" amend the Pension Plan until February 1, 1991, circumstantial evidence demonstrated that "the amendments were effectively made in October 1989." Noting that the Board made the amendments in October 1989 and notified employees by notice in October 1989 and again in January 1990, the court reasoned that while the Board formalized the amendments retroactively, it did not apply them retroactively. We cannot agree.
 
 
 10
 ERISA expressly provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. Sec. 1102(a)(1) (emphasis added). Indeed, pursuant to this section, this Court, in Nachwalter v. Christie, 805 F.2d 956 (11th Cir.1986), held that ERISA prohibits not only oral modifications, but informal written amendments of employee benefit plans as well. This Court explained that:
 
 
 11
 A central policy goal of ERISA is to protect the interests of employees and their beneficiaries in employee benefit plans. This goal would be undermined if we permitted oral modifications of ERISA plans because employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.
 
 
 12
 Id. at 960 (citations omitted); see also National Companies Health Benefit Plan v. St. Joseph's Hosp., 929 F.2d 1558, 1571 (11th Cir.1991); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990), cert. denied, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991). Other circuits have adopted similar rules. See, e.g., Schoonmaker v. Employee Sav. Plan of Amoco Corp., 987 F.2d 410, 412 (7th Cir.1993); Miller v. Coastal Corp., 978 F.2d 622, 624 (10th Cir.1992), cert. denied sub nom. Miller v. Pension Plan for Employees of Coastal Corp., --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993) ("An employee benefit plan cannot be modified, however, by informal communications regardless of whether those communications are oral or written.") (citations omitted); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 59 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993).
 
 
 13
 We find no legally significant distinction between an oral amendment and an oral amendment which is formalized in a writing months or years later and retroactively applied to the time of the oral amendment. Because we find oral amendments impermissible, we likewise conclude that subsequently formalized and retroactively applied oral amendments are impermissible. Here, as in Nachwalter, the central policy goal of ERISA--protecting the interests of employees in employee benefit plans--would be undermined if we were to permit subsequently formalized amendments to take effect as of their oral genesis. In the absence of documents, it would be impossible for plan participants to compare any "notices" of modification they might receive with the amendments themselves; in effect, they would be precluded from determining their rights and obligations at the time of the oral amendments.
 
 
 14
 The difficulties are clearly illustrated in this case where the notices to the employees did not, and perhaps, could not, completely or adequately explain the modifications to the Pension Plan. Indeed, in February 1990, the time the Credit Union would have the modifications retroactively apply, the employees would have been unable to completely describe the plan's terms, specify its benefits or coverage, or define eligibility requirements or limitations. The notices the Board "posted and/or distributed" did not protect the interests of the employees and their beneficiaries. For reasons such as these, we conclude that informal written modifications cannot save oral amendments from the requirements of ERISA.
 
 
 15
 Accordingly, we hold that any modification or amendment to an ERISA plan can be implemented or applied only after the amendment has been appropriately adopted in a formal, complete and written form. We find that in this case the Credit Union did not formally adopt the amendments in written form until February 1, 1991, and therefore, that Smith and the members of the Pension Plan subclass are entitled to benefits accrued until that date under the terms that existed before the amendments.
 
 B. The Savings Plan
 
 16
 Until 1990, the terms of the Savings Plan required the Credit Union to make contributions for all participants equal to 5% of compensation, and a contribution of 10% for those who became participants prior to August 15, 1981. Smith became an active participant before August 15, 1981.
 
 
 17
 On December 20, 1989, however, the Board approved an amendment to the Savings Plan (reflected in the minutes) reducing the 10% contribution to 5%, so that all participants would receive the same 5% contribution. On or about December 21, 1989, the Credit Union "posted and/or distributed" a notice to all employees advising them of the reduction.[8] On January 1, 1990, the Credit Union reduced its Savings Plan contributions to 5% for all employees. On January 3, 1990, the Credit Union "posted and/or distributed" a second notice. On December 28, 1992, the Credit Union executed a document reflecting the reduction of the 10% contribution, with an effective date of January 1, 1990.
 
 
 18
 We recognize that in this case the December 21, 1989 notice provided a clear statement of the change being made. However, the Board executed no formal written change to the Plan until December 28, 1992. Therefore, for the same reasons expressed in relation to the Pension Plan, we conclude that the Board's approval of the informal modification, albeit in conjunction with sufficiently explanatory written notices, did not satisfy ERISA's requirements. Accordingly, Smith is entitled to benefits accrued until the day his employment terminated, and members of the Savings Plan subclass are entitled to benefits accrued until December 28, 1992, under the terms that existed before the amendment.
 
 C. The Rule of 90
 
 19
 On April 20, 1988, the Board approved in principle an early retirement provision to the Pension Plan known as the Rule of 90. Although it never formally incorporated the Rule of 90 into the Pension Plan, the Board did add a provision regarding the Rule of 90 to the Employees' Manual, and opened an accrual account to fund the benefits. On September 23, 1991, the Administration, which had taken control of the Credit Union, terminated the Rule of 90.[9]
 
 
 20
 The district court concluded that the Credit Union adopted the Rule of 90 as an informal ERISA plan. However, because Smith was age 44 with 20 years of service at the time he left the Credit Union, the court concluded that he was not then, nor would he ever become, eligible to receive benefits under the Rule of 90 Plan. The court therefore declared Smith an inappropriate class representative and "rescinded" certification of the Rule of 90 subclass, entering summary judgment against Smith on his individual Rule of 90 claim, without prejudice to the unnamed members of the Rule of 90 subclass. We find no error in the district court's holding in this regard and affirm the dismissal of this claim.
 
 D. Principal as Fiduciary
 
 21
 The district court did not address the issue of Principal's fiduciary status because it granted summary judgment against Smith on all claims. Because several of Smith's claims survive after appeal, we must now reach the merits of the argument.
 
 
 22
 Based on Useden v. Acker, 947 F.2d 1563 (11th Cir.1991), cert. denied sub nom. Useden v. Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, --- U.S. ----, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993), we reject Smith's arguments that Principal is a fiduciary because of its involvement in the attempted amending of the Pension Plan. In Useden, this Court held that a law firm, which had advised an ERISA-governed profit sharing plan and trust on numerous facets of its activities, was not a fiduciary. Id. at 1577. The Court reached this result even though the firm had allegedly drafted amendments to the plan on its own initiative, id., and despite evidence suggesting that the firm knew or should have known that certain plan activities violated ERISA principles, id. at 1569.
 
 
 23
 In Useden, this Court noted that in some situations, an advisor's influence may become so great that it confers effective discretionary authority. Id. at 1578 n. 18. However, the Court rejected "a rule equating a law firm's advice in favor of a transaction with the named fiduciaries' actual decision to enter the transaction." Id. at 1578. The Court reasoned that imposition of fiduciary liability in such cases might "deter consultants such as attorneys from assisting plans." Id.
 
 
 24
 Although Useden concerned a law firm, the Court's analysis is equally applicable here. Under its agreement with the Credit Union, Principal is required to provide as part of its "regular" services "[c]ontinuing assistance through the years as changes in legislation occur that may affect the plan, and assistance in plan revisions to keep it modern." Smith has introduced no evidence to suggest that Principal's influence over the Credit Union was so dominant that it conferred de facto discretionary control over the Plan. See id. at 1578 n. 18.
 
 
 25
 We likewise reject Smith's argument that Principal is a fiduciary with respect to the improper calculation of his benefits. See Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290 (11th Cir.1989).
 
 III.
 
 26
 For the foregoing reasons, we affirm the district court's order granting summary judgment to defendants on Smith's claims pertaining to the Rule of 90 Plan, but we reverse the district court's order granting summary judgment to defendants, except Principal, on the Pension Plan and Savings Plan claims. We affirm the order granting summary judgment to Principal on all claims. We remand this case to the district court for further proceedings consistent with this opinion.
 
 
 27
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 Under its contract with the Credit Union, Principal provides "regular" services (which include annual reports of the value of the total fund, assistance with Federal Reporting and Disclosure requirements, continuing assistance with respect to legislative changes that might affect the plan, and assistance in plan revisions), recordkeeping for non-retired participants, and actuarial service
 
 
 [2]
 The certified plaintiff class comprises three subclasses that conform to the three plans Smith is challenging: (1) the Pension Plan subclass consists of all participants in the Credit Union's Pension Plan during the period February 1990 to February 1991; (2) the Savings Plan subclass consists of current and former employees of the Credit Union who were active participants in the Savings Plan between January 1990 and December 1992; and (3) the Rule of 90 subclass is composed of persons who were employees of the Credit Union between 1988 and 1991, and whose chronological age and years of service equalled 90 or would have equalled 90 at any time prior to age 65
 
 
 [3]
 A participant's retirement benefits were based on the sum of 44% of his average compensation up to the "integration level" (which was $550), plus 61% of average compensation in excess of the integration level; and participants could retire as early as age 55, subject to a reduction in benefits
 
 
 [4]
 The parties stipulated that the Credit Union "posted and/or distributed a notice in the customary manner typically used to disseminate employee communications and information to all employees."
 
 
 [5]
 The notice read:
 October 19, 1989
 Memo To: All Employees
 Subject: Staff Meeting--October 19, 1989
 From: Personnel
 Mr. Latham will visit the branches to review changes in our pension plan. The retirement age has been changed to age 65. To receive the maximum pension accrual, an employee will have to work 35 years. These changes do not affect previous benefit accruals.
 
 
 [6]
 The second notice read in pertinent part:
 January 18, 1990
 Memo To: All Employees
 Subject: Staff Meeting--January 18, 1990
 From: Personnel
 Pension statements for February, 1989, were distributed. These statements do show the changes made regarding 35 years of service and the integration factor. This statement does not, however, show the change in retirement age which was 62 and is now 65. Mr. Latham is conducting two more meetings to address pension changes on January 24, and 31.
 
 
 [7]
 The Pension Plan amendments include: (1) an increase in the normal retirement age from 62 to 65, effective February 1, 1990; (2) a change in the calculation of the benefit formula to 40% of average compensation up to the integration level, plus 60% of average compensation in excess of the integration level, effective February 1, 1990; (3) an increase in the integration level to the greater of $833.33 or 1/24 of the participant's covered compensation in the year the participant attains the Social Security retirement age, effective February 1, 1989; and (4) a change in factors for commencement of benefits at early retirement, effective February 1, 1989
 
 
 [8]
 The notice read in pertinent part:
 December 21, 1989
 Memo To: All Employees
 Subject: Staff Meeting--December 21, 1989
 From: Personnel
 There will be some changes in our Retirement Savings program effective January, 1990. The Credit Union will no longer be allowed to contribute 10% to the retirement savings program. Therefore, we will add 4% to the gross pay for the employees who are participating in the plan who have 10 years of employment service or who are currently receiving the additional 5% in retirement savings. (The Credit Union will continue to contribute 5% to the plan.) ... Meetings will be scheduled to review this information.
 
 
 [9]
 At the time of the termination, three employees had already retired under the Rule, while a fourth, who was also eligible for immediate benefits, continued in active employment. The Administration "grand-fathered in" the three who had retired, but did so without providing for cost of living increases