**Harvey STRAUS, Stanley Brodka, Charles J. Santilli, Leonard Goldberg, Robert W. Clark, Dennis Velasco, Dave Kievit, Anthony Naroiso, Gerald J. Rascoli, and Seymour Goldstein, Plaintiffs,**

v.

**PRUDENTIAL EMPLOYEE SAVINGS PLAN, Prudential Employee Savings Plan Administrative Committee, and Prudential Insurance Company of America, Defendants.**

No. CV 02 3067(RJD).

United States District Court, E.D. New York.

March 24, 2003.

440

Lawrence M. Rosenstock and Stacy B. Kreiger (Blank Rome Tenzer Greenblatt LLP, New York, NY), and David A. Dorey (Blank Rome Comisky & McCauley LLP, Cherry Hill, NJ), for the plaintiffs.

Lonie A. Hassel and Michael Joseph Prame (Groom Law Group, Chartered, Washington DC), for the defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiffs, all of whom are participants in the Prudential Employee Savings Plan ("PESP" or the "Plan"), bring this action under Section 502 of the Employer Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. Plaintiffs allege that defendants discriminated against them in violation of Section 510 of ERISA, 29 U.S.C. § 1140, by adopting and retroactively applying arbitrary limitations on their right under the Plan to transfer funds from one investment option to anoth-

er in unlimited amounts. Plaintiffs also claim that, in adopting these limitations, defendants violated ERISA by failing to follow the Plan modification procedures which govern Plan amendments. Finally, plaintiffs raise an estoppel claim based on their assertion that they reasonably relied on the language of the Plan, which said nothing about limiting trading amounts. Plaintiffs seek a preliminary injunction preventing defendants from enforcing the limitations and granting plaintiffs permission to conduct once daily fund transfers without any restrictions as to the amount of the transfer. Alternatively, plaintiffs seek expedited discovery. Defendants cross-move to dismiss the complaint on the grounds that plaintiffs have not stated a claim. For the reasons explained below, the Court denies plaintiffs' motion for a preliminary injunction and dismisses plaintiffs' claims under ERISA and the promissory estoppel theory.

## BACKGROUND

### A. The Prudential Employee Savings Plan

Plaintiffs are all current or former employees of defendant Prudential Insurance Company ("Prudential"). Prudential offers all of its employees the opportunity to participate in PESP, its employee benefit plan, which allows employees to set aside and invest income on a pre-tax and after tax basis. The Plan is flexible and provides several investment options. Under the Plan, each employee may invest in eleven different funds, including small cap mutual funds, international funds and money market funds. *See* Prudential Employee Savings Plan, Summary Plan Description, App. in Supp. at 31–32 ("SPD at __"). The Plan also gives employees the right to reallocate their contributions to a different fund and to transfer money into and out of these funds, but indicates that "[t]here

may be restrictions on some transactions, as described throughout this PESP SPD." SPD at 18. The SPD sets out these rules as follows:

> You can make or change your investment decisions for your current account balance or for your future contributions any business day in the following ways:
>
> ● Make or Change Allocation: You can make or change the investment allocation of future contributions to your account in multiples of 1%. You can make allocation changes for each account any business day. Changes will take effect as soon as administratively practicable after you request the change.
>
> ● Transfer Funds: You can change the investment of the money already in your account in multiples of 1%. You can make those transfers any business day, but they must be made by 4 p.m. Eastern time to be effective the same day. However, in certain situations (for example, excessive trading, etc.), there may be limitations regarding transfers. Please refer to the fund prospectus(es) and/or fact sheets for more information on any trading restrictions that may apply to the investment option(s) you choose, and to the online Terms and Conditions on the PESP Web site for more details.

*Id.* at 35. The SPD provides that employee investors may conduct such transactions via the Prudential intranet or the Internet, through an interactive voice response system, by speaking to a customer sales representative, or by written request through the mail. *Id.* at 54–55.

The fund prospectuses to which the above-quoted language refers, warn that frequent trading of shares in response to short-term market fluctuations, a practice known as "market timing," may disrupt the management of the fund. *See* Decl. of Jonathan D. Shain ¶ 2 ("Shain Decl. __").

For example, the prospectuses explain that fund managers will often be forced to sell securities at inopportune moments in order to have enough cash available to redeem the shares of those engaging in market timing trades, thus damaging the overall health of the fund. *See* Prudential International Value Fund Prospectus, Shain Decl., Ex. 1. For this and other reasons, the prospectuses advise investors that fund managers reserve the right to refuse purchase orders and fund exchanges if the fund manager believes the transaction will have a disruptive effect on the portfolio. *See id.* In addition to the prospectuses, the Plan itself states that the Administrative Committee "may decline to implement investment instructions where it deems appropriate . . . ." Prudential Employee Savings Plan December 2001 Restatement § 15.03, App. in Supp. at 174 ("Plan Document __"). The Plan Document, which contains this provision, is the full text of the Plan. The SPD, which is a summary of the main features of the Plan given to employee investors to provide them with key information about the Plan in a more easily understandable form, *see* SPD at 13, does not contain this provision.

The SPD and the Plan Document also set out rules for amending the Plan. The SPD states:

> The Company reserves the right—subject to applicable law—to amend, modify, suspend or terminate any part or all of the Plan at any time with or without notice or consent. Plan amendments, modifications, suspensions or termination may be made for any reason and at any time. Such amendments may be retroactive if necessary to meet statutory requirements or for any other reason.

. . . . . .

The PESP Plan Document describes the procedures for amending or terminating the Plan and who may make amendments.

SPD at 58. The Plan Document also states that the Plan may be changed at any time, and gives the authority to modify the plan to the Prudential Board of Directors, the Compensation Committee of the Board of Directors, and the Prudential Executive Vice President of Human Resources. *See* Plan Document § 17.01. In a separate section, the Plan Document grants the PESP Administrative Committee (the "Administrative Committee"), as Plan Administrator, the authority to establish "rules and procedures" to govern the investment elections and directions of the Plan participants. *See id.* § 15.03.

## B. Plaintiffs' Investment History

As Plan participants, plaintiffs educated themselves about the various investment options and developed strategies for maximizing the return on their investment. Plaintiffs acknowledge that they paid close attention to world events and market shifts in managing their investments. Indeed, plaintiffs explain that understanding the economic effects of the events of September 11, 2001, the tensions in the Middle East, and the Enron and Worldcom bankruptcies, to name a few, was critical to their strategy for protecting their retirement funds. In reaction to these events, many of the plaintiffs regularly transferred large amounts of money—sometimes in the hundreds of thousands of dollars—into and out of different Plan investment vehicles several times per month. Plaintiffs maintain that such transfers were permitted under the Plan, and that they had been investing in this manner very successfully for several years before Prudential began imposing restrictions on them. *See* Certification of Stanley Brodka ¶¶ 19–23 ("Brodka Certif. __").

Beginning in September 2001, plaintiffs began receiving letters from Prudential warning them that they had conducted at least one trade that "violate[d] Prudential Retirement Services policies on frequent trading." Brodka Certif. ¶ 25, Ex. A. The letters stated that the policies were explained in the fund prospectuses. Plaintiffs maintain that they examined the prospectuses closely, but found no specific "frequent trading" policy limitations. *Id.* ¶ 25. Confused by the letters, several of the plaintiffs called PESP customer service representatives to inquire about the restrictions. According to plaintiff Brodka, the representative to whom he spoke informed him that his fund transfers were permitted under the Plan, and that he could continue to trade as he had in the past, but that Prudential was in the process of formulating a new policy. The last of these letters was sent to plaintiff Brodka on November 30, 2001. Hearing nothing further from Prudential, plaintiffs continued to trade as before.

Four months later, the Administrative Committee sent letters, dated March 15, 2002, to all plaintiffs, each of which stated that the particular plaintiff had "performed trades ... that violate [PESP] policies on frequent trading in large amounts," and that, as a result, the Administrative Committee had suspended the plaintiff's ability to conduct trades electronically or by telephone for a period of thirty days. Letter of March 15, 2002, App. in Supp. at 72 ("March 15 Letter"). The plaintiffs retained the ability to submit requests for fund exchanges and transfers by letter, and that such requests would receive "expedited review for compliance with the policy." *Id.* After reminding plaintiffs that the Administrative Committee retained the authority to establish rules and procedures governing investment directions, the March 15 Letter advised plaintiffs that the Committee had

determined that frequent, large-scale, "market timing" trading of the sort which plaintiffs conducted could have a detrimental impact on the Plan as a whole. The March 15 Letter explained that because PESP combines the trades of all its participants before processing investment directions, trading in large amounts by a few participants could cause the aggregate PESP trade to become so large that mutual fund managers might refuse to process the request, as described in the fund prospectuses. Thus, the March 15 Letter concluded that, in order to prevent fund managers from blocking the trades of all PESP participants for the impropriety of a very few, the Administrative Committee was restricting to written investment requests for a period of thirty days "those [participants] identified as repeat frequent traders in large amounts who have directed individual trades of more than $75,000 into and out of the same investment option multiple times in the past 30 days and who have received more than one warning letter from [Prudential]." *Id.*

In April, the Administrative Committee published a formal policy statement which tracked the language of the March 15 Letter, and which plaintiffs received on April 10. *See* "Administrative Committee Policy on Market Timing and Frequent Trading in Large Amounts Under the Prudential Employee Savings Plan," App. in Supp. at 74–75 ("April Policy"). The April Policy listed three criteria that had to be satisfied for the trades to be considered "Frequent Trades" prohibited by the "Market Timing Policy:"

1. **Specific Time Period**: Trades occurring within a 30–day period.

2. **Roundtrip**: A series of at least two trades that include one or more transfers *into* an investment option AND one or more transfers *out* of the *same* investment option in either order (i.e.,

in/out, or out/in), regardless of any multiple transfers from or to other different investment options during the Roundtrip, and

3. **Trade Amount**: A trade of $75,000 or more.

*Id.* According to the April Policy, one violation would result in a warning letter. After two violations, the investor would receive a "Suspension Notification Letter" signifying the beginning of a thirty-day suspension period in which the Administrative Committee would consider only written investment requests. *Id.*

In mid-April, once the Administrative Committee had lifted their suspensions, plaintiffs once again began trading as they had in the past. Pursuant to the April Policy, they again received warning letters, identical to those received in the fall of 2001, that their conduct violated PESP policies on frequent trading. *See* Brodka Certif., Ex. B. Plaintiff David Kievit, who received a warning letter for a trade he made on May 2, 2002, called Austin Lyons, a PESP representative who was identified in the March 15 Letter as someone to whom investors should direct questions concerning PESP policies. After being informed that his trade exceeded the dollar limit of the April Policy, Kievit asked Lyons whether transferring $70,000, rather than $75,000, into two different funds on the same day and then transferring $75,000 out of both funds within thirty days would violate the April Policy. Lyons responded that such a transfer would not be permitted under the April Policy because the trade amount limit was based on an "aggregate" trade of $75,000 within the thirty-day period. Aff. of David Kievit ¶¶ 3–4. According to Kievit, Lyons further told him that the April Policy was "poorly written" and that the omission of the word "aggregate" from the language of the April Policy was "a material omission."

*Id.* ¶ 5. This conflicts with what plaintiff Brodka asserts that Lyons told him on March 14, 2002, when he called to inquire about his March–April suspension. Brodka maintains that Lyons defined "frequent trading" as "any *single* transfer of $75,000 or more into an investment option, followed by another transfer exceeding $75,000 back out within thirty days." Suppl. Decl. of Stanley Brodka ¶ 5 ("Brodka Suppl. Decl. __").

Following the warning he received in May, Brodka maintains that he adhered to the rules outlined in the April Policy. Nevertheless, Brodka was again suspended for trades he made in late July 2002. On July 25, Brodka transferred $75,000 out of the Prudential International Value Fund, and then transferred less than $75,000 back into the same fund on July 29. Prudential froze his PESP account the next day. Brodka Suppl. Decl. ¶¶ 8–9. Similarly, plaintiff Seymour Goldstein was suspended that same day for transferring over $75,000 from the Fixed Interest Fund to the International Value Fund on July 24 and then transferring it back the next day despite the fact that he had not previously violated the April Policy and thus expected a warning letter before suspension. *See* Decl. of Seymour Goldstein ¶¶ 2–5. According to defendants, PESP took this action because it had received an email from the fund manager of the International Value Fund stating that he was refusing to honor the aggregate PESP trade of approximately $11 million for July 29, 2002. *See* Second Decl. of Amy D. Slute ¶ 2. To avoid this, the Administrative Committee identified those investors requesting trades on July 29 who had transferred amounts in excess of $75,000 into and out of the International Value Fund the previous week. The Committee then removed the trades of these nine investors bringing the aggregate PESP trade for July 29 down from approximately $11 mil-

lion to approximately $1 million, which was approved by the fund manager. *Id.* ¶¶ 3–4.

According to plaintiffs, this rule concerning "aggregate" trades was new, and was retroactively applied to them despite the fact that the rule had never been communicated to them. Brodka Suppl. Decl. ¶ 12. Following the decision of July 29, PESP revised its Market Timing Policy to reflect the change. *See* Administrative Committee Policy on Market Timing in Large Amounts, Pls.' Suppl. App. at 237 ("August Policy"). The definition of "Market Timing Trade" still consists of three criteria. *Id.* The first two, "Specific Time Period" and "Roundtrip," are defined more or less as they are in the April Policy, but the third criterion, "Trade Amount" is defined as "[a]n aggregate amount of $75,000 or more (for example, a purchase of fund shares for $50,000 and a sale of $35,000 of the same fund's shares the next day would be an aggregate trade amount of $85,000)." *Id.* The August Policy also adds a "Permanent Suspension" provision that states that a participant will be permanently suspended from making anything other than written investment transactions requests (i.e., the participant is barred from making Intranet-, Internet-, telephone- or fax-based transactions) if he or she has received two or more thirty-day suspensions and thereafter attempts a Market Timing Trade. *Id.* Finally, the August Policy outlines a hierarchy of steps that the Administrative Committee will take if a particular aggregate PESP trade is rejected by the fund manager in order to insure that the trade is not blocked. *Id.*

## DISCUSSION

Plaintiffs seek a preliminary injunction enjoining defendants from enforcing both the April Policy and the August Policy, and granting plaintiffs permission to trans-fer funds into and out of any of the eleven investment options listed in the Plan, on any business day, in unlimited amounts. Defendants cross-move to dismiss plaintiffs' complaint, arguing that blocking plaintiffs' trades and adopting the April and August Policies do not constitute actionable "discrimination" under § 510 of ERISA, 29 U.S.C. § 1140, that the same actions did not violate ERISA rules or the Plan's own rules governing Plan amendments, and that plaintiffs have failed to state a claim of promissory estoppel. The Court addresses these issues in turn, first determining which of plaintiffs' claims are viable as plead, and then considering whether plaintiffs are entitled to a preliminary injunction or expedited discovery on any surviving claim.

### A. Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (internal quotations omitted). In considering the motion, the court must take "as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life Ins. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994). Therefore, the court may not dismiss a complaint "simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo,* 58 F.3d 814, 818 (2d Cir.1995). Rather, the complaint should be dismissed only if, assuming to be true all facts alleged, plaintiff still fails to plead the basic elements of a claim. *Id.*

### B. ERISA claims

#### i. § 510 Discrimination Claim

■ § 510, the anti-discrimination provision of ERISA, states:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

§ 510 of ERISA; 29 U.S.C. § 1140 (1982).

What a plaintiff must plead to make out a § 510 claim, however, is not entirely clear. Indeed, the circuits are split on the meaning of a number of § 510's terms. One major dispute is whether non-employee beneficiaries of pension plans are entitled to § 510's protections, or whether § 510 only protects *employees* from adverse employer action that intentionally deprives them of their pension rights. A majority of circuits have adopted the latter view: that the employer-employee relationship is the only one that is covered. *See e.g., Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990) ("It is clear from the text of the statute ... that § 510 was designed to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a pension right."); *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.), *cert denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). As the Second Circuit stated in dicta in *Dister*, § 510 "was designed primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" *Dister v. The Continental Group, Inc.* 859 F.2d 1108, 1111 (2d Cir.1988), *quoting West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980). Or as *Swanson v. U.A. Local 13 Pension Plan* held, " § 1140 [the Code equivalent of § 510] only reaches conduct which fundamentally changes the employer-employee

relationship so as to interfere with pension rights." *Swanson v. U.A. Local 13 Pension Plan*, 779 F.Supp. 690, 701 (W.D.N.Y. 1991).

Other circuits, however, have advanced the view that § 510 has a much broader application. *Mattei* argues persuasively that while the employer-employee relationship has certainly been the prototypical covered relationship under § 510, it is merely "an illustrative but non-exclusive description of a set of rights that are protected by § 510 ... " *Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir.1997). As *Mattei* points out, § 510 specifically covers "participants" and "beneficiaries," and "[s]urely only a small proportion of designated *beneficiaries* will ever have been employed by the participant's plan sponsor or fiduciary ... ." *Mattei*, 126 F.3d at 802 (emphasis in original). Moreover, as *Mattei* explains, the definitional section of ERISA, 29 U.S.C. § 1002(7), defines the word "participant" to include both employees and former employees. *Id.* Thus, the *Mattei* court reasons, § 510's protections must at least be broad enough to incorporate non-employee beneficiaries and former employees. The Fifth Circuit has promoted a similarly broad view, arguing in *Heimann* that § 510 covers retired employees as well as current employees. *Heimann v. The National Elevator Industry Pension Fund*, 187 F.3d 493, 507 (5th Cir.1999). Finally, the First Circuit has argued that changes made to the pension plan itself, rather than actions taken within the employment relationship to affect pension rights, may constitute discriminatory action under § 510. As it stated in *Aronson*, the "discriminatory modification of a pension or retirement plan that intentionally benefits or injures certain identified employees" violates § 510. *See Aronson v. Servus Rubber, Div. Of Chromalloy*, 730 F.2d 12, 16 (1st Cir.1984), *cert. denied*, 469

U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1974).

The parties in the instant case predictably adopt these two opposing views. Defendants argue that the actions that plaintiffs seek to redress do not concern plaintiffs' employer-employee relationships; indeed, eight of the ten plaintiffs are no longer employees of Prudential. Plaintiffs' claims instead revolve around changes made to the pension plan itself. However, such claims, defendants assert, are not actionable under § 510 and should be dismissed. Plaintiffs assert that under the *Mattei / Heimann* line of cases, the fact that some of the plaintiffs are no longer employees is irrelevant, and that their claims of discriminatory administration of the pension plan itself are cognizable under § 510.

While the Second Circuit has not spoken squarely to this question, this Court is inclined to agree with plaintiffs on this point. It seems only logical that former employees and beneficiaries, who in many instances have as strong an interest in their pension rights as their employee counterparts, receive some protection from the alienation of those rights under § 510. And the textual arguments of *Mattei* and *Heimann* are compelling. Thus we hold that plaintiffs, even the non-employee plaintiffs, are entitled to bring a § 510 claim.

█ Plaintiffs' allegations, however, run aground on another element of § 510. Indeed, plaintiffs have not properly alleged that they were "exercising any right to which [they were] entitled" or that defendants "interfered with the attainment of any rights." As *Owens v. Storehouse, Inc.* explains, such a "right" must be "one specifically conferred by the plan or by ERISA." *Owens v. Storehouse, Inc.*, 984 F.2d 394, 399 (11th Cir.1993). While plaintiffs assert in their complaint that they had

"rights explicitly granted in the Plan Documents" (Comp.¶ 36) allowing them to "transfer...unlimited amounts of funds within the Plan" once each day (Comp. ¶ 35), the Court finds that this assertion really amounts to a conclusory allegation—an incorrect one to boot.

In fact the Plan and the SPD, which plaintiffs have incorporated as exhibits into the complaint, flatly contradict this allegation. Nowhere in the Plan or the SPD do the words "transfer of unlimited amounts" appear. On the contrary, the Plan explicitly states in § 15.03 that "[t]he Administrative Committee may decline to implement investment instructions where it deems appropriate...." Comp. Pa. 174. Even the SPD, which plaintiffs argue ought to control in the case of inconsistency with the Plan, clearly advises that "in certain situations (for example, excessive trading, etc.), there may be *limitations* regarding transfers." SPD, Comp. Pa 35 (emphasis added). As these documents make clear, the Plan and its administrators at all times retained the privilege of limiting and blocking transfers, particularly when trading was excessive. Given such explicit limitations, plaintiffs' assertion that they had the right to "unlimited" transfer of funds defies common understanding of the word "unlimited."

In their brief, plaintiffs attempt to salvage this claim by arguing that, while the SPD may have contained a general reference to limitations on excessive trading, the plan never defined excessive trading in any way, nor were plan employees able to explain what it meant when plaintiffs inquired into the matter. Since no one could explain the specifics of this limitation, they conclude, by implication "no such limitation on 'excessive trading' existed...." Pl. Memo in Support of Order to Show Cause, pp. 14–15. Such reasoning is clearly spurious. A non-specific limitation is nonethe-

less a limitation. To argue as plaintiffs have is akin to arguing that since your mother did not tell you how long you were grounded for, you must not be grounded. Indeed, such arguments only serve to prove the opposite point, namely that a general limitation was in place and that plaintiffs were well aware of its existence.

All of these elements combine to undermine plaintiffs' allegation that they had a "right" to unlimited transfers within the Plan. While the Court is obliged to draw all inferences in favor of plaintiffs on a motion to dismiss, conclusory allegations such as this one which are clearly refuted by other parts of the complaint will not suffice to satisfy the pleading requirements. Indeed as *Finkel v. Putnam Convertible* has held, "Giving Plaintiff the 'benefit of all doubts' on a Rule 12(b)(6) motion to dismiss does not require courts to ignore contradictions between the allegations in the Complaint and disclosures in the Prospectus because such contradictions indicate that 'no set of additional facts could prove the plaintiff's claims.'" *Finkel v. Putnam Convertible Opportunities and Income Trust*, 1997 WL 371177 at *3 (S.D.N.Y.1997), citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996). Accordingly, plaintiffs' discrimination claim under § 510 of ERISA is dismissed.

*ii. Improper Modification*

 Plaintiffs next argue that defendants violated ERISA by improperly modifying its terms. ERISA requires employee benefits plans, such as the one at issue in this case, to "provide a procedure for amending [the] plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). The Supreme Court has clarified that § 1102(b)(3) does not require that the pro-

cedures be adumbrated with any particular level of specificity, but merely "that there *be* an amendment procedure." *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). Thus, a plan that places the power to amend in identified individuals or entities, even without elaborating further on how they may do so, satisfies the requirements of § 1102(b)(3). *See id.* at 80–85, 115 S.Ct. 1223 (holding that an employee benefits plan which stated only that "[t]he Company" had the authority to amend the plan did not violate § 1102(b)(3)); *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 984 (2d Cir.1997) (citing *Curtiss–Wright*). Nevertheless, once the plan has identified who may alter it, only those individuals and entities may do so. *See Inter–Modal Rail Employees Assoc. v. Atchison, Topeka and Santa Fe Ry. Co.*, 520 U.S. 510, 515–16, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) (employers may change the plan, but "must follow the formal procedures set forth in the plan"); *Curtiss–Wright*, 514 U.S. at 85, 115 S.Ct. 1223 ("[W]hatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level.").

Plaintiffs point out that the only ones with the authority to amend the PESP are: (1) the Board of Directors of Prudential, (2) the Compensation Committee of the Board of Directors, and (3) the Prudential Executive Vice President of Human Resources. Plan Document § 17.01. Hence, plaintiffs argue that, because the Administrative Committee has the authority only to administer the Plan as written[1] and not to modify it, its adoption of the April and August Policies did not comply with the Plan's amendment procedures. Defendants concede that the Administrative

---

1. *See* Plan Document § 14.02.

Committee has no power to amend the Plan, but contend that the Committee always held the authority under the Plan to reject investment directions in appropriate situations and to establish rules and procedures governing transfers under the Plan. Accordingly, defendants maintain that the actions taken by the Administrative Committee did not constitute Plan amendments and therefore did not violate ERISA.

The Court agrees with defendants. The Plan Document clearly states that "the Administrative Committee may decline to implement investment instructions where it deems appropriate." Plan Document § 15.03. The Plan Document also grants the Administrative Committee the power to adopt "rules and procedures" to govern "[a]ll Participant elections and directions under the terms of the Plan." *Id.* Thus, in blocking plaintiffs' trades and in promulgating the April and August Policies, the Administrative Committee was exercising powers that it already possessed under the terms of the Plan. No amendment took place.

In this respect, this case is similar to *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71 (2d Cir.1998). In *Krumme*, only the company's Board of Directors possessed the authority to amend the employee benefits plan. *Id.* at 75 n. 5. However, the plan explicitly gave the company's Pension Plan Committee the power to change the actuarial assumptions which formed the basis for calculating an employee's accrued retirement benefits, and adopt new discount rates "from time to time." *Id.* at 74–75. Relying heavily on *Dooley v. American Airlines*, 797 F.2d 1447 (7th Cir.1986), a case with virtually identical facts, the Second Circuit determined that the Pension Plan Committee was acting under its pre-exiting authority to adopt new actuarial assumptions, and was not amending the terms of the plan itself. *See*

*Krumme*, 143 F.3d at 85 (citing, *inter alia, Dooley*, 797 F.2d at 1452 ("[W]e are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which [is] already firmly ensconced in the pension document."); *Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552, 1561 (D.C.Cir.1984) (there is no "amendment" when a "provision already incorporated into the plan [is] *applied* [and][a]ctions authorized by the plan [a]re carried out by the persons authorized to do so")). As in these cases, the Administrative Committee validly exercised the discretion afforded to it under the terms of the Plan, and did not amend it. *See Krumme*, 143 F.3d at 85; *Tourangeau v. Uniroyal, Inc.*, 189 F.R.D. 42, 46–47 (D.Conn.1999).

■ Nor were the April and August Policies improperly applied retroactively to plaintiffs, as they contend. Plaintiffs cite *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986) and *Smith v. National Credit Union Administration Board*, 36 F.3d 1077, 1081 (11th Cir.1994) for the proposition that an oral or informal written modification or amendment to an ERISA plan can be applied only after it has been reduced to "a formal, complete and written form." *Smith*, 36 F.3d at 1081. Plaintiffs contend that the new trading restrictions were improperly applied to them in violation of ERISA when they were suspended after the March 15 Letter, despite the fact that the restrictions were not formally established until the adoption of the April Policy. Plaintiffs also assert that the same violation occurred when they were again suspended for conducting "aggregate" trades in amounts over $75,000 during the course of a thirty-day period, despite the fact that the new rules concerning "aggregate" trades were not formally established until the adoption of the August Policy.

■ Nevertheless, *Nachwalter* and *Smith* are distinguishable. First, these cases involved amendments to an ERISA plan. *See Nachwalter,* 805 F.2d at 958–59; *Smith,* 36 F.3d at 1079–80. In the case at bar, the defendants did not amend the Plan: they simply modified the rules governing transfers under the authority granted by the Plan. Second, even assuming that the same retroactivity principles apply to modifications made in accordance with the terms of the Plan, as opposed to modifications of the Plan itself, the retroactive application of the April and August Policies did not violate ERISA. As plaintiffs concede, ERISA permits employers to amend an employee benefits plan retroactively under appropriate circumstances. *See Dyce v. Salaried Employees' Pension Plan of Allied Corp.,* 15 F.3d 163, 165 (11th Cir.1994). Such retroactive amendments are permissible if they do not deprive the employee of a right to which they are entitled. *See id.; Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa,* 130 F.3d 950, 954–55 (10th Cir. 1997). As previously explained, plaintiffs do not have a right under the Plan to trade in unlimited amounts. Defendants could therefore retroactively apply the April and August Policies without violating ERISA. Accordingly, plaintiffs' claim that defendants violated ERISA by improperly amending the Plan is dismissed.

## C. Promissory Estoppel

■ To state a claim of promissory estoppel under ERISA, a plaintiff must allege the following: 1) a promise, 2) reliance on the promise, 3) injury caused by the reliance, and 4) injustice if the promise is not enforced. *Bonovich v. Knights of Columbus,* 146 F.3d 57, 62 (2d Cir.1998). Moreover, under ERISA, a plaintiff must demonstrate that the defendant reasonably should have expected the promise to induce action or forbearance on the plaintiff's part. *Bonovich,* 146 F.3d at 63. Promissory estoppel is not relief that is commonly granted, however; as *Bonovich* states, "[t]he Second Circuit has held that the principles of estoppel apply in ERISA cases only under extraordinary circumstances." *Bonovich,* 146 F.3d at 62. An ERISA plaintiff must therefore "adduce [ ] not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir. 1999), (quoting *Devlin v. Transp. Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir. 1999)).

Plaintiffs maintain that they have met the requirements for promissory estoppel. In their pleadings, they identify a "promise" made by defendants, namely the promised "right in the Plan Document to transfer daily unlimited amounts of funds in a participant's account between the options afforded by the Plan Document." Comp. ¶ 41. By publishing those terms, plaintiffs allege, "Defendants, intentionally, or under such circumstances as were both naturally and probably likely to induce action from the Plaintiffs as well as all Plan participants, represented that it would permit the once-daily transfer of funds between the investment options provided by PESP." Comp. ¶ 42. Plaintiffs "relied, in good faith and to their detriment," upon this promise, "expecting that they were permitted to transfer funds in their own discretion in accordance with these rights." Comp. ¶ 43. As a result of such reliance, plaintiffs "continued to invest in PESP, and continued to be participants in PESP" and were damaged when defendants "eliminat[ed] or substantially cut[ ] Plaintiffs' investment options...." Comp. ¶¶ 44–45.

While these allegations seem to track the promissory estoppel requirements, they still fail, however, to state a promissory estoppel claim. Indeed, plaintiffs' claim fails on the first prong-demonstrating that the defendants made them a promise on which they reasonably relied. As the Court found above, defendants never made any promise of a right to unlimited fund transfers to plaintiffs. On the contrary, defendant's publications expressly reserved a right to limit participants' fund transfers at the Plan's discretion. "[T]o invoke promissory estoppel, it is elemental that employees must establish that their employer made them a promise." *American Federation of Grain Millers*, 116 F.3d at 984. Since plaintiffs are unable to satisfy this first prong, this claim of promissory estoppel must be dismissed.

Plaintiffs have also raised in their Reply Memorandum two new grounds for promissory estoppel, however. They cite two additional promises made by defendants: 1) the statement made by defendants' "authorized agent" in the fall of 2001 that plaintiffs "could ignore the warnings and continue to transfer as usual," and 2) the statement in the new April 2002 policy that they could "make single transfers in amounts below the $75,000" without having their accounts suspended. Pl. Reply Memo at 16. Plaintiffs allege that they relied on these two promises and were damaged when their accounts were suspended in spite of their compliance with these two policies.

Again, these allegations initially appear to satisfy the pleading requirements for promissory estoppel, but ultimately fall short. While the allegations contain colorable claims that defendants made promises meant to induce plaintiffs' reasonable reliance, plaintiffs have failed to plead facts which satisfy the "extraordinary circumstances" requirement. As *Aramony* has

held, plaintiffs must allege facts which suggest that "the surrounding circumstances are indeed beyond the ordinary." *Aramony*, 191 F.3d at 152; citing *Devlin v. Transp. Comms. Int'l Union*, 173 F.3d 94, 102 (2d Cir.1999) (emphasizing that a finding of "extraordinary circumstances" requires a "remarkable consideration" such as the use of a promise of benefits to induce certain behavior on the employee's part). Additionally, the facts demonstrating "extraordinary circumstances" must go beyond the four prongs of the promissory estoppel claim-there must be some plus factor beyond a simple showing of reliance on a promise, harm and injustice. *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 85–87 (2d Cir.2001). The prototypical example of such "extraordinary circumstances" in the Second Circuit is *Schonholz*, in which a senior-level employee was induced to resign from employment through the promised receipt of severance benefits which were subsequently revoked. *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72 (2d Cir.1996); *see also Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d at 86–87 (finding extraordinary circumstances where employer intentionally induced plaintiffs to remain employees rather than pursue higher paying salaries through the promise of lifetime insurance benefits and then denied those benefits when employees were of an age when they could not make up the salary difference or obtain alternative benefits).

Plaintiffs, by contrast, have made no allegation that defendant received any "remarkable consideration" such as resignation of employment or foregone salaries in return for their reliance on Prudential's promises that they could continue trading unimpeded. Indeed, it is hard for the Court even to articulate what consideration if any Prudential received in exchange for its promise-perhaps plaintiffs'

agreement to abide by their new policy, or construed most generously, maybe plaintiffs' decision to continue investing their money with Prudential. In this sense, the facts of this case seem closer to the facts of *Hart v. The Equitable Life Ass. Soc.,* 2002 WL 31682383 (S.D.N.Y. Nov.26, 2002) (HB), in which the plaintiff was given inflated estimates of her retirement income by defendant's employees, estimates which were later reduced after the mistake in calculation was discovered. In *Hart,* as in our case, defendant had little to gain from the promise it made to plaintiffs; the perceived promise stemmed largely from defendant's mistake and misinformation. Just as the *Hart* court ruled conclusively that there were no extraordinary circumstances, this Court finds too that the extraordinary circumstances requirement of promissory estoppel has not been met. Accordingly, the motion to dismiss on the claims of promissory estoppel is granted.

*D. Preliminary Injunction*

Lastly, plaintiffs have moved for a preliminary injunction to enjoin defendants' new market timing policies and the resultant suspensions of their ability to transfer funds, actions which they argue were made in violation of ERISA.

[13] The Second Circuit has held that to succeed on a motion for preliminary injunction, the movant generally must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See Devlin Graphic Industries, Inc. v. Lewis,* 2001 WL 310626 at \*5 (S.D.N.Y.2001); *Brenntag Int'l Chemicals v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999); *Jackson Dairy v. H.P. Hood,*

596 F.2d 70, 72 (2d Cir.1979). These requirements apply to motions for preliminary injunction brought under ERISA. *See e.g., Maltz v. Aetna Health Plans of New York, Inc.,* 114 F.3d 9, 11 (2d Cir. 1997); *Communications Workers of America v. NYNEX Corp.,* 898 F.2d 887, 890 (2d Cir.1990).

■ Plaintiffs contend that they have demonstrated both a likelihood of success on the merits as well as irreparable injury. However, considering the dismissal of plaintiffs' § 510 and improper amendment claims, the assertion that plaintiffs are likely to succeed on the merits is unavailing. Plaintiffs' motion for preliminary injunction is therefore denied on this ground alone.

■ Even if plaintiffs were likely to succeed on the merits, however, they have also failed to demonstrate that they would suffer irreparable injury if denied a preliminary injunction. Their first argument-that ERISA does not require a showing of irreparable injury to obtain an injunction-is facially incorrect. The case law they cite from other circuits simply is not the law in the Second Circuit, which has consistently held that irreparable injury must be shown to prevail on a motion for preliminary injunction. *See* discussion *infra.* Plaintiffs' second argument-that monetary damages that are incalculable necessarily constitute irreparable injury-is equally unconvincing. To be sure, while the two cases that plaintiff cites for this proposition do involve injury where monetary damages were difficult to calculate, they are both readily distinguishable from the present case in that they both demonstrate an imminent harm that will befall plaintiffs if an injunction is not granted-in one case, the loss of customer goodwill and fair competition and in the other case, the loss of customers and damage to a company's reputation. *See Basicomputer Corp. v. Scott,*

973 F.2d 507, 512–13 (6th Cir.1992) and *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 13 (1st Cir.2000). Plaintiffs are unable to recite any specific harm that will imminently result from their inability to transfer unlimited amounts of money to and from the various funds. As *Seide* and other courts in this circuit have held, "[t]o establish an irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Seide v. Crest Color, Inc.,* 835 F.Supp. 732, 735 (S.D.N.Y.1993). Examples of such irreparable harm found by courts in the Second Circuit include the imminent loss of medical benefits and the substantial danger that disputed funds might not be collected due to an employer's bleak financial condition. *See Communications Workers of America,* 898 F.2d at 890; *Demolition Workers Union v. Mackroyce Contracting Corp.* 2000 WL 297244 at *8 (S.D.N.Y. 2000). Unlike these examples, the harm cited by plaintiffs, while admittedly difficult to calculate, is vague and speculative. As such, it fails to constitute the irreparable harm needed to invoke a preliminary injunction. Accordingly, plaintiffs' motion for a preliminary injunction is hereby dismissed.

### CONCLUSION

For the foregoing reasons, the Court denies plaintiffs' motion for a preliminary injunction and dismisses plaintiffs' claims under ERISA and the promissory estoppel theory.

SO ORDERED.